THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GEORGE BROWN, Appellant.

First Department, June 6, 1978

APPEARANCES OF COUNSEL

*Jane B. Malmo* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Richard M. Joel* of counsel *(Allan D. Marrus* with him on the brief; *Mario Merola, District Attorney),* for respondent.

### OPINION OF THE COURT

Birns, J. P.

We would affirm the convictions of defendant for murder (two counts), robbery in the first degree and possession of a weapon as a felony.

The evidence to support the convictions was overwhelming and this conclusion is accepted by the dissent. We are divided over the issue whether defendant had a fair trial.

Subjectively, opinions may vary on the issue whether a trial was fair, but admeasurement of this trial by an objective standard would not warrant a conclusion of unfairness *(People v Alicea,* 37 NY2d 601; *People v Crimmins,* 36 NY2d 230).

In our opinion the record is not so replete with error by the prosecutor and the court as to have denied defendant a fair trial under the Constitution. Nor is there here such obfuscation of the development of factual issues which sidetracked "the jury from its basic mission of determining the facts relevant to guilt or innocence." *(People v Alicea, supra,* p 605.) Certainly if a trial is unfair an appellate court must disregard proof of guilt even if overwhelming. However, there is, as will be shown, very little in this record to support the conclusion in the dissent that there was in this trial "almost complete abandonment of the rules of fair play".

It was indeed a senseless and brutal murder. The killing occurred during the commission of a robbery in which $25 was taken from a register. The jury heard testimony from four witnesses who linked defendant to the commission of the crime. David Himelberg, age 67, the proprietor of the shop in which his wife was shot and killed before his eyes on May 8, 1974 made an in-court identification of defendant as the perpetrator. Two soda deliverymen, the Leak brothers, chased the perpetrator through the streets, from the time he left the shop, for a sufficient length of time to identify him from the witness stand. Each of them recalled defendant wearing a brown jacket. Significantly, after losing sight of defendant on a street, they saw him minutes later on a neighborhood stoop not too far from the shop shaking hands with another man and immediately gave this information to the police. The police ascertained that the man on the stoop who greeted the perpetrator was Jerry Clark. Clark testified that defendant ran up to the stoop, saw Clark, shook Clark's hand, and then continued running down the street. Within moments the Leak brothers were at the stoop with a police officer and Clark was asked to tell who the man was whom he had greeted. Clark's acquaintance with the perpetrator furnished a firm lead identifying defendant as the perpetrator.

The .22 calibre bullet which caused Mrs. Himelberg's death, though deformed, had a righthand twist and when defendant was arrested, 14 days later on May 22, 1974, a .22 calibre six-shot revolver was recovered in defendant's apartment. It was found to contain five bullets and there was evidence that it had been fired recently. Ballistic experts could not say that the bullet extracted in the autopsy indeed came from the recovered revolver, but the revolver also had a righthand twist and the fatal bullet was consistent with having been fired from defendant's revolver. In defendant's apartment was a brown jacket which the two Leak brothers testified was like the one worn by the perpetrator when he ran from the Himelberg store.

Thus there was direct and circumstantial evidence more than sufficient to establish defendant's guilt.

The defense offered to the jury was alibi and misidentification.

Rachael Fogg (sister of defendant's girlfriend), Myra Cabble (Rachael's sister-in-law) and Agnes Titley (building superin-

tendent), all residing at 1980 Marmion Avenue where defendant was allegedly visiting, testified that defendant was in front of the building on May 8, 1974, from 11:00 A.M. to 2:00 P.M. Hence, it was argued that defendant could not have committed the crime. In an effort to explain the recent firing of the weapon, defendant's girlfriend testified that while she had been with defendant in a park before his arrest defendant had fired at a tree.

At the trial the accuracy of the identification testimony was challenged in two respects as it is now on appeal: One, there was a failure by Mr. Himelberg to identify defendant in a lineup, and two, it was a police officer, Detective Drummond, who suggested defendant to the Leak brothers as the perpetrator and improperly bolstered their testimony.

In further support of its thesis that defendant did not have a fair trial, the dissent points to a number of instances of alleged misconduct by the prosecutor and the court. It is claimed that the alibi witnesses were improperly cross-examined in an effort to show that their information concerning defendant's whereabouts at the time of the crime was not brought by any of them to the attention of the police, and that the court improperly charged the jury on the defense of alibi. Further, that the court, although properly applying the *Sandoval* rule by refusing to suppress the use of the defendant's record on cross-examination by the District Attorney in the event defendant testified,[1] perverted the *Sandoval* procedures by refusing to permit cross-examination of the prosecutor's witness Ezel Leak on the same subject and by permitting the District Attorney to unduly elaborate on the nature of Clark's acquaintance with defendant while both were in the same prison; that in summation the District Attorney made improper reference to Mrs. Himelberg lying in her grave; and that evidence of Mr. Himelberg's attempt to correct his error at the lineup injected incurable error into the trial.

The dissent faults the District Attorney for improperly cross-examining defendant's alibi witnesses. The error ascribed is to be found in the questions directed to the failure of each alibi witness to inform the police promptly that defendant was with the witness at the time the crime was taking place in the Himelberg store. Moreover, it is claimed that it was improper for the District Attorney in summation to argue

---

1. Defendant did not testify either at the *Wade* hearing or at trial.

that the alibi witnesses had a duty to give the police the information each assertedly possessed.

■ Whether any witness is to be believed, and to what extent, is a fact issue for a jury. The credibility of an alibi witness is subject to attack as that of any other witness, and thus, the bias, prejudice, hostility or friendliness of such a witness for defendant is a proper subject for cross-examination (*Davis v Alaska,* 415 US 308; *Alford v United States,* 282 US 687; *People v McDowell,* 9 NY2d 12). Generally any evidence destructive of an alibi is competent (Fisch, New York, Evidence, tit IV, ch 10, § 240). Accordingly, whether testimony of an alibi is true or is of recent fabrication may be tested by appropriate questions. Certainly the failure of an alibi witness to disclose an alibi until trial must be of interest to fact finders. There is no sound reason why a jury should be deprived of the reasons for this failure in performing their function of determining the truth.

■ Although there is no duty on the part of an alibi witness to report information as to the alibi to the police (*People v Smoot,* 59 AD2d 898; *People v Hamlin,* 58 AD2d 631, 632; cf. *People v Owens,* 58 AD2d 898),[2] nevertheless whether the alibi was only recently disclosed is a factor a jury should consider in assessing the weight to be given to the testimony of such a witness.

In reviewing the record, we find that defense counsel in every instance permitted the District Attorney without objection to cross-examine the witnesses on the failure to transmit the alibi to the police. It is conceivable that the defense was satisfied with their testimony and sought benefit from the explanations given by the witnesses, and for that reason failed to object on any legal grounds.[3]

For example, we find the following questions and answers in the testimony of Rachel Fogg:

Q. By the way, Mr. Lee asked you if you came to see me. I'm the assistant district atty. in this case.

A. Yes.

Q. Do you know the law says you must come and see me, it's required, that's the law. You didn't come to see me voluntarily?

---

**2.** The *Hamlin* and *Smoot* decisions were filed in June, 1977, two years after the trial herein.

**3.** Contrast *People v Milano* (59 AD2d 852), where the prosecutor over sustained objections by defense counsel persisted in questioning an alibi witness as to his failure to inform police as to the alibi.

A. No.

Q. The law says you must come and see me, right? Are you aware of that?

A. I was subpoenaed.

Q. And when did you come and see me?

A. The week before last. I don't remember the day.

Q. About a week ago?

A. It wasn't a week.

Q. About a week and a half ago?

A. Right.

Q. You came to see me. I'm the assistant district atty., a week and a half ago; is that correct?

A. Yes.

Q. And you came to tell me that we locked up an innocent man, right?

A. Yes.

Q. How come you waited a year to tell us we locked up an innocent man?

A. Why I waited a year?

Q. Why didn't you come see the police May 22nd?

A. Because I never was told to come to court or notified to come to court.

Q. Did you ever think of telling the police they locked up the wrong man when he was arrested?

A. Was I suppose to go to them and tell them you locked up the wrong man?

Q. Yes. You're telling this jury we locked up an innocent man. Why didn't you tell us that when he was arrested? Why did you wait a year for that?

A. I didn't know. I didn't think I'm a witness or what. I didn't know anything about it.

Q. Your sister was living with him when he was arrested, correct?

A. Right.

Q. And you didn't know he was arrested, your sister didn't tell you?

A. I knew he was arrested.

Q. Why did you wait a year to tell us he was the wrong man?

Mr. Lee: I object to the DA yelling at the witness.

The court: Yes, do not shout at the witness.

Q. Why did you wait, Miss Fogg, to tell us we arrested the wrong man. Why did you wait one year to say we had the wrong man?

The Court: Let the witness answer.

A. Because I knew he was with me and I waited all this time because I didn't know that I had to come to court.

The Court: Madam, the district atty. just asked you, you knew he was arrested on May 22nd.

The Witness: Yes.

The Court: Why did you wait until a week ago before you came to his office. That is all he asked you.

The Witness: Because I didn't know that he was going for trial or whatever. I didn't know this.

Q. Why didn't you go to the police station that arrested him and tell him that they arrested him and tell him that they arrested the wrong man. Why didn't you do that the day he was arrested?

A. Because I didn't know what day he was arrested on.

We find the following questions and answers in the testimony of Myra Cobble:

Q. By the way, why didn't you tell any policeman or a district attorney that you were with George Brown the day of the murder? Why did it take you a year to tell us?

A. This is when the trial came up and not only that, I didn't want to come to court. I had a subpoena to come today.

Q. Why didn't you want to come to court?

A. I just didn't want to get involved with that. It's a very serious crime and it is something that you really had to be sure about.

■ An inquiry into a "duty" to go to the police with information a person assertedly possesses, should be excused if the purpose of the questions was to determine when such information was first acquired and why such information was not disclosed (see *People v Hamlin*, 58 AD2d 631, *supra*, dissenting opn of MARTUSCELLO, J. P.). Certainly such inquiry should not be labeled unfair, where there was no objection. Here, the District Attorney was probing each alibi witness to determine whether testimony concerning alibi was "fabricated".

In summation by the District Attorney, we do not find, as argued by defendant in his brief, any express avowal that an alibi witness has a duty to report to the police. Nevertheless, we do find repeated argument by the District Attorney that the jury should assess delay in disclosing the "alibi" in determining whether the testimony of any alibi witness should be accepted. Therefore, we find that neither the questions put to the alibi witnesses nor the summation of the District Attorney on the issue of alibi were improper.

■ The dissent asserts that the charge of alibi was patently incorrect. We would agree only that one sentence of the alibi charge was questionable. The court should have stated unequivocally that if the evidence as to alibi raises a reasonable doubt, then the defendant was entitled to an acquittal, not that "the defendant [was] entitled to have the testimony fairly treated like any other testimony offered in his behalf". Certainly the court's instruction was inappropriate, but no objection was expressed as to this particular language, and in other portions of the charge the court repeatedly emphasized that a verdict of guilt could be returned only if the jury were so

convinced beyond a reasonable doubt. In fact, the court stated: "In case of a reasonable doubt as to whether the guilt of the defendant has been proved by the People the defendant is entitled to an acquittal. You will not be justified in returning a verdict of guilty against the defendant until you are satisfied beyond a reasonable doubt of the defendant's guilt". Further, the court instructed that "the jury should acquit the accused, the defendant herein, unless such identification is established beyond a reasonable doubt". It also said, "An alibi defense if true is evidence of innocence" and further, "No one is so dextrous that he can be in two places at the same time."[4]

All in all, the jury was instructed that if the evidence raised a reasonable doubt as to defendant's guilt he was entitled to an acquittal and we see no basis for returning this case to court for a more specific instruction on alibi when the charge as a whole correctly presented to the jury the burden shouldered by the prosecution.

We do not agree that the District Attorney impermissibly elicited evidence from Detective Drummond to the effect that both Leak brothers had identified photographs of defendant, thus bolstering their in-court identification in violation of *People v Trowbridge* (305 NY 471, 477). Testimony concerning photo identification by the Leak brothers was given on redirect examination of Detective Drummond to answer issues raised by defendant in cross-examination where counsel brought out that neither the Leak brothers nor Jerry Clark had been produced at the lineup obviously leaving an image in the mind of the jury that those witnesses were not produced there because their testimony was tailored. Thus, the door to such redirect examination was opened by the defendant. The District Attorney had an obligation to correct that impression by having the detective explain that the Leaks were not produced because they had already reviewed an array of photos—and that Clark knew defendant and did not have to be at the lineup. No effort was made by the District

---

4. Defendant's counsel requested the following charge which the court observed it had covered in its charge: "The defense of alibi that the Defendant was at another place at the time in question was committed on May 8th, 1974 is as proper and legitimate, if proved, as any other defense, and you should consider all the evidence bearing upon it. And if in view of all the evidence, you have any reasonable doubt as to whether the defendant *was in some other place [sic]* when the crime was committed, you must give the defendant the benefit of the doubt and find him not guilty."

The record does not show that defense counsel took exception to the court's refusal to charge in the precise language requested.

Attorney to elaborate on the details of the photographic identification. There was merely an attempt to correct the jury's misimpression *(People v Lindsay,* 42 NY2d 9, 12). This explanation was made by the District Attorney in summation without objection and in these circumstances should not be construed now as bolstering.

Reference to photo identification by the Leak brothers is nonprejudicial in this case if we look to the rationale underlying its prohibition—that on the prosecution's case an inference may be drawn by the jury that defendant has a criminal record *(People v Griffin,* 29 NY2d 91, 95, JASEN, J. dissenting; *People v Caserta,* 19 NY2d 18, 21). But here, it was defense counsel who, upon cross-examination of Detective Drummond, first elicited the fact that defendant had been identified through photos. Thus, the cited error was not error at all in the context of this trial.

Nor may reference to the Leak brothers' simultaneous identification of Brown's picture properly serve as a ground for reversal in this case since none of us is of the opinion, apparently, that their in-court identifications should be suppressed on the grounds that they were tainted by this pretrial procedure.

In voting to reverse, the dissent would apply the rules without reference to the specific facts of this case and it should be beyond argument that where identification is as strong as it is here, the alleged errors, if errors at all, are meaningless *(People v Johnson,* 32 NY2d 814, 816; *People v Baskerville,* 27 NY2d 966; *People v Bryant,* 39 AD2d 80, affd 31 NY2d 744).

Our dissenting brother's criticism of the *Sandoval* restriction placed by the trial court on the use of the criminal record of witness Ezel Leak as "perverted" is unwarranted, as is his reliance on *People v Smoot* (59 AD2d 898, *supra).*

Ezel Leak not only testified at the trial but also at the *Wade* hearing and had been excused as a witness when defense counsel sought to have him recalled after discovering, as did the District Attorney belatedly, that Ezel Leak had a criminal record. In *Smoot (supra), Sandoval* was applied to a nondefendant witness who was on the stand. Here the parties stipulated long after Ezel Leak was excused as a witness and just before the case was submitted to the jury to call the jury's attention to certain misdeeds of this witness. The court ruled that reference could be made to Leak's convictions for petty

larceny in 1967 and receiving stolen property in 1975, and at the suggestion of counsel a stipulation to that effect was read to the jury. Many of the items of the witness's prior record excluded by the court related to Family Court matters which obviously could not be treated as criminal convictions, and in only one instance did the court exclude a prior conviction for possession of a drug in 1963 because of remoteness.

Trial Judges know of the difficulty of recalling an excused witness, as the record herein reflects. The trial court sought to protect the equities of the prosecution and the defense counsel through the stipulation read to the jury. Rather than a perversion of the *Sandoval* ruling, it was a practical solution designed to avoid delay in continuing the trial and meet the desire of the defense to have the witness's criminal record before the jury. The court's resolution of the problem presented can be considered nothing other than fair.

Jerry Clark, who brought the name of defendant to the attention of the police, told of meeting defendant in prison. The dissent is of the opinion that there was undue reference to the prison so as to make it apparent that defendant had a criminal record. Certainly, disclosure of a prison relationship between a witness and a defendant in a criminal case before a jury should be treated on trial with great delicacy and avoided because of the possibility of prejudice inherent in such testimony. Here, on the direct examination of Jerry Clark, the People shunned disclosure that Clark had first met defendant in prison and relied on an earlier public school relationship to establish that Clark and defendant were acquainted. It was only when the witness was under cross-examination by defense counsel that the prison relationship between the witness and defendant was divulged. There was nothing in the redirect examination by the District Attorney which tended, as our colleague claims, to overemphasize the nature of Rikers Island, the institution where Clark and defendant were confined, to the detriment of defendant. The questions put by the District Attorney in redirect examination could serve only to substantiate the identification of defendant as a person whom the witness Clark had known in the past, and support the conclusion that the witness had not been in error when he gave defendant's name to the police.

Mr. Himelberg's son, Norman, testified that after the lineup his father stated that because of emotional distress and fear he had identified the wrong man. The court, upon request by

counsel, struck the answer from the record. The dissent would add this episode to its list of improprieties corrupting the trial.

However, on cross-examination defense counsel attacked the witness as being responsible for his father's efforts to correct the error in identification. In short, the defense recognized an opportunity to discredit David Himelberg's testimony. Norman Himelberg was not a professional witness who should have known better. As the son of the deceased, the tragedy of his mother's death could not be expected to remain outside the courtroom door. The trial court dealt with this demonstration of emotional distress in adequate fashion. Although it is true we cannot "unring" a bell, no trial which encompasses the unforeseen extermination of a parent could survive appellate review were we not permitted to assume that in such a case the jury possesses the ability to follow an instruction to disregard that which should not have been uttered and render its verdict upon the "evidence" in the case.

For this reason we also find no basis to conclude that there was such impropriety in the prosecutor's summation as to consider any reference to the anniversary of Mrs. Himelberg's death therein as a substantial factor contributing to an unfair trial.

Finally, we find that the charge was not an imbalanced presentation favoring the prosecution as argued on appeal. The court did not, contrary to defendant's assertion, restate identification testimony "as if cross-examination had not been part of the case". In fact, no objection to the marshalling of evidence was recorded by defense counsel except as to one portion of testimony which the court corrected promptly.

The dissent has chosen to base alleged errors in the presentation of evidence by the prosecution and error in the court's charge as justifying the conclusion that the trial was unfair.

In this case the District Attorney has indeed struck "hard blows", but not "foul ones". (*United States v Berger,* 295 US 78, 88.) However, the trial court did not fail to afford defendant a fair hearing. As CARDOZO, J. observed in *Snyder v Massachusetts* (291 US 97, 122): "Privileges so fundamental as to be inherent in every concept of a fair trial that could be acceptable to the thought of reasonable men will be kept inviolate and inviolable, however crushing may be the pressure of incriminating proof. But justice, though due to the accused, is due to the accuser also. The concept of fairness

must not be strained till it is narrowed to a filament. We are to keep the balance true."

As in the *Crimmins* case (36 NY2d 230, 238, *supra),* "[t]here is no predicate here * * * for any claim that this defendant * * * was deprived of any * * * basic right."

In the circumstances provided by the record the test whether there should be a reversal and a new trial can be found in the following observation in *People v Crimmins (supra,* p 242): "If, however, an appellate court has satisfied itself that there was overwhelming proof of the defendant's guilt, its inquiry does not end there. Under our system of justice a jury is not commanded to return a verdict of guilty even in the face of apparently conclusive proof of the defendant's guilt. Similarly it may and often does exercise a positive sense of moderating mercy. Further inquiry must accordingly be made by the appellate court as to whether, notwithstanding the overwhelming proof of the defendant's guilt, the error infected or tainted the verdict. An evaluation must therefore be made as to the potential of the particular error for prejudice to the defendant. We hold that an error is prejudicial in this context if the appellate court concludes that there is a significant probability, rather that only a rational possibility, in the particular case that the jury would have acquitted the defendant had it not been for the error or errors which occurred."

In our opinion, there is no "significant probability * * * that the jury would have acquitted the defendant had it not been for the error or errors which occurred." *(People v Crimmins, supra,* p 242.) Therefore, there is no legal reason to disturb the verdicts of guilty returned by the jury.

Accordingly, the judgment of the Supreme Court, Bronx County (BLOUSTEIN J.), rendered June 19, 1975, convicting defendant after a jury trial, of the crimes of murder (two counts), robbery in the first degree and possession of a weapon as a felony, should be affirmed.

MARKEWICH, J. (dissenting). The trial of this felony murder case was that replete with error on the part of both court and prosecutor as to deny defendant-appellant his fundamental right to a fair trial, despite the mass of evidence against him. It may be observed that no one of these errors standing alone might be deemed sufficient to have required vacatur of the verdict; their summation, however, was that inconsistent with

fairness as to require reversal. In any event, as strong as the case for conviction may be, there must be a limit beyond which it cannot be said that error is harmless. Where error has accumulated to the point that no heed is paid to the concept of fairness, it seems a mockery of the processes of justice to attempt to determine precisely how the result of the trial might have been affected had any particular error not occurred. No crime, however heinous, can justify the almost complete abandonment of the rules of fair play evident is this record. "Not only the individual defendant but the public at large is entitled to assurance that there shall be full observance and enforcement of the cardinal right of a defendant to a fair trial. The appellate courts have an overriding responsibility, never to be eschewed or lightly to be laid aside, to give that assurance. So, if in any instance, an appellate court concludes that there has been such error of a trial court, such misconduct of a prosecutor, such inadequacy of defense counsel, or such other wrong as to have operated to deny any individual defendant his fundamental right to a fair trial, the reviewing court must reverse the conviction and grant a new trial, quite without regard to any evaluation as to whether the errors contributed to the defendant's conviction. The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right." (People v Crimmins, 36 NY2d 230, 238.)

The majority has painstakingly answered every assertion made in this writing—indeed, some in defendant's brief with which we do not agree. However, there are too many errors to explain as harmless, too many protestations found necessary to justify the rather tepid "opinion [that the trial] * * * is not so replete with error". It is true that "Subjectively, opinions may vary on the issue whether a trial was fair". Of necessity, the exercise of "discretion in the interest of justice" must be based on subjective, even visceral considerations. However, with no insight except that gleaned from the cold record, we are unable to put ourselves in the places of the jury, which returned the verdict here reviewed, sufficiently quasi-subjectively to determine the extent to which the unfairness of the trial brought about the result reached. It is sufficient to observe for justification of remand for a new trial that the record reflects the grave danger that the jury was so influenced.

A senseless and brutal murder of an elderly woman store

proprietor was committed by a robber in the presence of her husband and partner. He gave chase but could not overtake the perpetrator, who was also observed by one Clark, who knew this defendant. The fleeing robber was also seen during his flight by the brothers Leak, deliverymen on the street. All three testified that it was defendant they saw and placed at or near the scene of the crime. The defense was alibi, testified to by four witnesses. Obviously, the key issue was the identity of the perpetrator, and the greater part of the trial errors had to do with this aspect, though others were equally prejudicial.

The District Attorney impermissibly elicited evidence from a detective to the effect that both the Leak brothers had identified photographs of defendant, thus bolstering their identification. (See *People v Trowbridge,* 305 NY 471, 477; *People v Griffin,* 29 NY2d 91.) To add to the bolstering, the prosecutor, in his closing argument to the jury, commented on this circumstance, thus compounding the error. Further, the manner of their inspection of the pictures was highly suggestive, being in the back of the Police Department vehicle, in each other's presence, not alone indicative of the pictures being mug shots, but permitting each of the brothers to be suggestible to the process of selection by the other. (See *People v Leite,* 52 AD2d 895.) Another instance of improper bolstering occurred in respect of identification of defendant by the surviving husband of the deceased woman. Too distraught to identify any photo shown to him, he also selected a person other than defendant at a lineup. Later, realizing his error, he called the detective on the telephone to correct it. His son was permitted to testify to this conversation. Though this evidence was ordered stricken, the damage had been accomplished. This is the sort of trial instruction to a jury which has been pithily characterized as "unringing a bell."

The alibi witnesses were attacked mercilessly on cross-examination, the prosecutor charging them with violation of a nonexistent duty to advise the police of their knowledge of defendant's actual whereabouts. These questions and their implications were highly improper. (See *People v Hamlin,* 58 AD2d 631; *People v Milano,* 59 AD2d 852; *People v Smoot,* 59 AD2d 898.) Further, the charge on alibi was patently incorrect: "If the evidence as to the alibi raises a reasonable doubt in your mind as to whether the accused was present at the time and place where the alleged crime was committed, then the defendant is entitled to have the testimony fairly treated

like any other testimony offered in his behalf." Whatever meaning may be gleaned from this instruction, it is not an appropriate substitute for the proper instruction, i.e., that, in such circumstance, defendant would be entitled to acquittal. Further prejudicial error was committed when the court, after properly denying defendant's motion under *People v Sandoval* (34 NY2d 371) to suppress use of his criminal record in cross-examination, perverted the *Sandoval* procedures by refusing to permit cross-examination of the prosecutor's witness Ezel Leak on the same subject. Though the District Attorney made some concession as to the witness' record, defendant was entitled to conduct the projected examination. (See *People v Smoot, supra.*)

While it may have been proper to establish that the witness Clark's acquaintance with defendant began in a prison, the propriety of the type of question asked about that institution could only have served to overemphasize its nature. Thus, it would be immediately apparent that defendant, who did not testify, had a criminal record. Nor did this overzeal cease during the closing argument, highly inflammatory, the least objectionable reference being to the deceased victim of the murder, lying in her grave, and that defendant still lived while she was dead.

It is noted that the court told the jurors, amongst other generalities, that only they were the judges of the facts. However, this kind of lip service—"too little, too late"—was insufficient in any meaningful degree to overcome the mass of error which inevitably made the presumption of innocence—also charged—a dead letter. The techniques used to assure defendant's conviction were effective; they were not fair, and a new trial is indicated.

Accordingly, the judgment of conviction of murder and related crimes, rendered in Supreme Court, Bronx County (BLOUSTEIN, J., and a jury), on June 19, 1975, should be reversed, as a matter of discretion in the interest of justice, and the case remanded for a new trial.

EVANS, LANE and SANDLER, JJ., concur with BIRNS, J. P.; MARKEWICH, J., dissents in an opinion.

Judgment, Supreme Court, Bronx County, rendered on June 19, 1975, affirmed.