THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JERRY LEE KNOX, Appellant.

Fourth Department, November 16, 1979

### APPEARANCES OF COUNSEL

*Edward J. Nowak, Public Defender (William Pixley* of counsel), for appellant.

*Lawrence T. Kurlander, District Attorney (David Pogue* of counsel), for respondent.

### OPINION OF THE COURT

WITMER, J.

The principal issue presented on this appeal is whether the questions by the District Attorney addressed to defendant and his witnesses on cross-examination concerning an alibi, and his comments on the answers in his summation, constitute error and require reversal. We conclude that in the context in which the questions were asked and the summation was made, they were proper and, at any rate, even if erroneous in any respect, they constituted harmless error.

Complainant, William Moshier, was the superintendent of an apartment building and collected the rents. On April 3, 1975 at 7:30 P.M. he was watching television in his living room with a family friend and neighbor, Patty Knox, while his wife, Patricia Moshier, was in the kitchen preparing supper. Moshier answered a knock at the door and three black males appeared, with scarves over their faces. One had a gun and

each of the other two carried a knife. They forced their way in and demanded money. One of them went directly to the kitchen and held a knife at Mrs. Moshier's throat and ordered her to be quiet. She screamed uncontrollably, and later testified that either he dropped his mask or she pulled it down and she recognized him as the defendant, whom she well knew, as he was the separated husband of Patty Knox, the guest in the living room. In the living room Moshier denied having any money. The two intruders then went directly to his reclining chair, turned it over and took a moneybag concealed under it, containing $1,000 of newly collected rents, in cash and checks. On leaving the gunman shot Moshier through the hand and into the right temple. The protection of his hand is said to have saved his life. He was taken to a hospital, accompanied by his wife and Patty Knox, and the latter two then went to police headquarters and made statements. After treatment in the hospital Mr. Moshier was able to return home with his wife and Patty Knox. Mrs. Knox testified that she remained with the Moshiers for two weeks thereafter, and that she was divorced from defendant on December 1, 1975. Nevertheless, at the trial she testified in defendant's behalf.

Defendant's defense was that Mrs. Moshier erred in identifying him as one of the intruders, and that in fact he was elsewhere at the time of the entry and robbery. On this appeal he contends that the District Attorney's questions to him and to three of his witnesses concerning his alibi constituted reversible error. It is noted, at the outset, that directly after defendant's indictment the District Attorney demanded notice of any alibi defense which defendant intended to interpose (CPL 250.20, subd 1), but defendant made no response to the demand for seven months and not until six days before the trial. That not only limited the District Attorney's opportunity to meet such defense but it whetted his suspicion that it was recently fabricated and his doubts of the veracity of the defendant and his alibi witnesses.

Defendant attacked the credibility of Mrs. Moshier in her identification of him in an interesting manner. Patty Knox, testifying for defendant, stated that previously Mrs. Moshier had lent $5 to defendant; that on April 3, 1975 Mrs. Moshier telephoned to defendant's mother about the loan and after returning from the hospital at about 2:00 A.M. on April 4, 1975 she again telephoned to defendant's mother. Defendant's mother testified that Mrs. Moshier telephoned her in the early

morning hours of April 4, 1975 and told her that she had been robbed but that she could not see who was the robber and that she asked defendant's mother to have defendant call her in the morning. Defendant testified that he did call Mrs. Moshier in the morning of April 4, and she told him that she had been robbed by someone who looked like him but she was so hysterical at the time that she was not sure who it was. Prior to the above evidence by the defense, defendant's attorney had cross-examined Mrs. Moshier, during which she testified that she had never lent any money to defendant nor had she made any telephone call to defendant's mother on April 3 or 4, nor did she have a telephone conversation with defendant after the robbery concerning the robbery, the identity of the robber or otherwise.

At the time of trial defendant had been in jail for nine months awaiting trial. In light of that fact and defendant's contentions, the District Attorney cross-examined him and his witnesses as to why the asserted alibi facts had not been made known sooner.

The right of a defendant to remain silent *(People v Christman,* 23 NY2d 429) suggests a different approach in the cross-examination of him concerning his alibi from that used in cross-examining his alibi witnesses. We shall, therefore, first consider the cross-examination of defendant. That cross-examination, to which he now takes exception but as to which no objection was made at the trial, was as follows:

"Q. You didn't turn yourself in April 4, did you—

"A. No, sir, because—

"Q.—after talking to Patricia Moshier?

"A. No, sir.

"Q. You didn't turn yourself in after talking to your mother about this?

"A. I didn't know that I was a suspect of no robbery, you know, it wasn't no—

"Q. You didn't know it?

"A. No, right. I didn't know at the time but when I did find out I turned myself in.

"Q. Well, you had information from Mrs. Moshier that she had seen somebody rob her and she thought it was you but she wasn't sure because she was hysterical.

"A. Right.

"Q. But you didn't think you were no suspect?

"A. Right, I knew I was not a suspect.

"Q. Because you hadn't been there, is that right?

"A. Right.

"Q. You didn't go over to Patricia Moshier's apartment and talk to her further about this, did you—

"A. No, sir.

"Q.—after talking to her on the telephone?

"A. No, sir.

"Q. You didn't want to find out any more facts about it, did you?

"A. No, she had done told me enough on the telephone.

"Q. You were sure she had told you enough?

"A. Yes, sir.

"Q. Weren't you yourself curious to see if she had given your name to the police?

"A. No, sir.

"Q. You weren't?

"A. No, sir.

"Q. You didn't pick her up at her apartment and take her down to police headquarters and try to clear the matter up, did you?

"A. No, sir."

In addition, in summation the District Attorney said to the jury, "He does nothing, he doesn't go over and take her down to police headquarters and have her explain some alleged mistake". Defendant claims that the above questions and comment constitute reversible error.

■ Those questions went directly to the truth of defendant's testimony with respect to his alleged telephone conversation with Mrs. Moshier on the morning after the robbery, which tended to impeach Mrs. Moshier's testimony that she had not talked with defendant nor admitted to him that she did not recognize her assailant. The District Attorney sought evidence to support any inference that, since Mrs. Moshier had testified that she clearly identified defendant as one of the robbers, if she had talked with defendant on the telephone the next day she would have accused him and, if he were innocent as he claimed, he would have gone to the police to clear it up. His denial of knowledge that Mrs. Moshier was accusing him, and

his failure to attempt to clear it up, suggest that the telephone call never occurred. Thus, the District Attorney's inquiries were not directed to the believability of the alibi but to the credibility of defendant's efforts to discredit Mrs. Moshier's testimony.

Moreover, defendant's failure to speak out at that time, that is, his silence, occurred prior to his arrest. Such silence has a different import from silence after an arrest when clearly a defendant has the right to remain silent. In *Doyle v Ohio* (426 US 610, 619) the court said, "We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warning, violated the Due Process Clause of the Fourteenth Amendment." Here, the District Attorney made no inquiry as to defendant's silence at the time of his arrest or later, and made no comment thereon in his summation. There is no proscription, however, against questioning a defendant concerning his prearrest silence (see *United States v Vega*, 589 F2d 1147, 1150 [CA 2d, 1978]). Thus, the District Attorney committed no error in these respects.

We shall now consider the matter of the cross-examination of defendant's alibi witnesses and the District Attorney's comments in his summation on the answers of one of them. The questions related to the alleged telephone calls from Mrs. Moshier to defendant's mother and were similar in each case, and consist substantially of the following:

(Mrs. Patty Knox)

"Q. And you derived certain information from that phone call, didn't you?

"A. Yes.

"Q. And when you had that information, did you ever make an effort to go back to the detective bureau and tell him some of this new information?

"A. Not that I can recall.

"Q. No. Did you go back to the detective bureau and ask if you could make another supporting deposition?

"A. No.

"Q. Isn't it because, Mrs. Knox, you knew these allegations weren't true and you couldn't swear to these new allegations?

"A. No."

On the summation the District Attorney said: "Why didn't she

go to the police and tell them, or why didn't she go to the district attorney's office and tell them? Why didn't she go to someone? Isn't it because there was no new information for all those months until we got very close to the trial?"

The questions to Mrs. Carrosella Knox, defendant's mother, were in part as follows:

"Q. Mrs. Knox, after having these alleged conversations with somebody who identified herself as Patricia Moshier, did you ever relate this to any of the other authorities?

"A. Did I ever do what?

"Q. Did you ever tell any of the police or detectives that you had these phone conversations with someone named Patricia Moshier?

"A. No, I never did.

"Q. You didn't. Did you ever demand to go to the preliminary hearing and tell the people that they had the wrong person?

"A. I never been there. * * *

"Q. Did you go to the Court on any other different occasions regarding Jerry on this charge?

"A. No.

"Q. You didn't ask anybody if you could testify and tell them that they had the wrong person, did you?

"A. Say, I never did talk with no one.

"Q. Right. Isn't that true, you never asked anybody if you could tell your story, up until this time?

"A. Well, I know—I knew—

"Q. Yes or no, Ma'am.

"A. Say, I never talked with nobody. * * *

"Q. Other than this Court appearance today you are now going through, on any other occasions since April 3, 1975, did you ask to go to Court and tell anything about your son not doing this alleged crime?

"A. Was I asked?

"Q. Did you yourself ask?

"A. No, I didn't ask.

"Q. Okay. You didn't go to the authorities, the police, and tell them you had—they had the wrong person, did you?

"A. No, I didn't go down to the police.

"Q. You didn't come into the district attorney's office and say that the police arrested the wrong person, did you?

"A. No, I didn't, no."

The District Attorney made no comment thereon in his summation.

The questions to Carol Knox, defendant's sister, were as follows:

"Q. When you found out that he was in trouble, did you go to the police and tell them he was with you—

"A. No, I didn't.

"Q.—and couldn't possibly be the right man?

"A. No.

"Q. Did you come to the district attorney's office and tell the district attorney's office that the police arrested the wrong man?

"A. No, I didn't.

"Q. Did you request to go to any Court proceedings and testify on behalf of your brother prior to this incident of testifying?

"A. Yes, I were.

"Q. Which proceeding did you want to testify at?

"A. For this one.

"Q. All right. Other than this one, and since the time of this incident, April 3, 1975, did you go to Court on behalf of your brother and ask to testify for him?

"A. No."

The District Attorney made no comment thereon in his summation.

■ Cross-examination of an alibi witness for the purpose of implying that the witness had a duty to report to the police or District Attorney or testify before the Grand Jury is improper and constitutes reversible error (*People v Dale*, 65 AD2d 625; *People v Maschi*, 65 AD2d 405; *People v Altman*, 63 AD2d 684; *People v Cox*, 61 AD2d 1035; *People v Lindsay*, 61 AD2d 992; *People v Smoot*, 59 AD2d 898; *People v Milano*, 59 AD2d 852; *People v Mims*, 59 AD2d 769; *People v Hamlin*, 58 AD2d 631). This salutary principle,* however, may not be employed to bar a prosecutor's attack on the truth of an alibi so long as

---

* Note that in *Doyle v Ohio* (426 US 610, 616, n 6, *supra*) the court indicated that it did not reach this and related issues.

it is not done in such manner as to imply that the witness had a duty to go to the police or other authorities promptly and reveal the alibi *(People v Brown,* 62 AD2d 715; and see *People v Colarco,* 68 AD2d 430; *People v Keller,* 67 AD2d 153, 161-162; *People v Maschi,* 65 AD2d 405, dissenting opn by SILVERMAN, J., pp 412-413).

In this case the questions went directly to the truth of the alibi and no suggestion was made that the witnesses had a duty to report to the police or other authorities. Defendant had been in jail for months preceding the trial and most of that time was in default in answering the District Attorney's demand under CPL 250.20 (subd 1) that he give the District Attorney notice within eight days of any alibi which he intended to assert in his defense. If the alibi were true, it is most likely that these witnesses, being so close to defendant, would have wanted to reveal their knowledge of his innocence to the authorities or at least to someone. Thus, whether or not they did so, bore importantly on their credibility.

In *People v Brown* (62 AD2d 715, 720) the court wrote: "The credibility of an alibi witness is subject to attack as that of any other witness, and thus, the bias, prejudice, hostility or friendliness of such a witness for defendant is a proper subject for cross-examination *(Davis v Alaska,* 415 US 308; *Alford v United States,* 282 US 687; *People v McDowell,* 9 NY2d 12). Generally any evidence destructive of an alibi is competent (Fisch, New York Evidence, tit IV, ch 10, § 240). Accordingly, whether testimony of an alibi is true or is of recent fabrication may be tested by appropriate questions. Certainly the failure of an alibi witness to disclose an alibi until trial must be of interest to fact finders. There is no sound reason why a jury should be deprived of the reasons for this failure in performing their function of determining the truth." Even though it may be proper to probe the veracity of the witness by inquiring as to whether he ever told his alibi information to anyone before the trial, in each particular case the court must determine whether in the context of the questions and their phraseology the District Attorney has improperly implied that the witness had a duty to go to the police or other authorities and reveal the alibi (see *People v Colarco,* 68 AD2d 430, 432-433; *People v Maschi,* 65 AD2d 405). The division in the court in *Maschi* (opn, p 407, dissent, p 412) indicates that at times it is difficult to determine whether the questions improperly imply a duty on the witness to go to the police.

Because of the danger inherent in questions of this sort, it is wise that, in every case where they are asked, the court charge the jury (1) that there is no duty upon a witness to go to the authorities and disclose alibi information and the jury may draw no inference of innocence or guilt of the defendant from the failure of a witness to make such prior disclosure and (2) that such evidence may only be considered on the question of the credibility of the witness (see *People v Burgos,* 69 AD2d 783, concurring opn by BLOOM, J.). No such request was made of the court in this case.

Even in a case where such questioning is improper, however, it will not be deemed reversible error if the evidence of defendant's guilt is strong *(People v Burgos, supra; People v Colarco, supra).*

In the case at bar not only was Mrs. Moshier certain of her identification of defendant but the evidence strongly suggests that the intruders had received evidence from inside the Moshier apartment, because they went directly to the victim's chair and removed the moneybag from beneath it; and defendant's wife, who was a visting neighbor of Moshier's at the time, testified in his behalf. Even if the jury might have inferred from the questions that defendant's witnesses had a duty to report their alibi information to the police, the questions went much more forcefully to their credibility for not revealing the information to anyone. The prosecutor's summation with respect to this point, quoted above, was quite innocuous.

The prosecutor did err, however, in his summation in characterizing some of the evidence and expressing his personal opinion thereon, and he also erred in referring to "facts" not in evidence. Nevertheless, these comments were not so blatant as to taint the evidence or verdict and, in view of the proof of defendant's guilt, must be deemed harmless error *(People v Crimmins,* 36 NY2d 230, 242).

We also note that the alleged errors in the questioning and in the summation were not preserved by objection or exception. Although in the interest of justice we nonetheless have power to review such errors and alleged errors (CPL 470.15), we find no reason to invoke that authority in this case.

The judgment should, therefore, be affirmed.

CARDAMONE, J. P., SIMONS, DOERR and MOULE, JJ., concur.

Judgment unanimously affirmed.