Keith GAYLE, Petitioner-Appellant,

v.

Eugene LeFEVRE, Superintendent, Clinton Correctional Facility, Defendant-Appellee.

No. 850, Docket 78–2158.

United States Court of Appeals, Second Circuit.

Argued April 10, 1979.

Decided Jan. 11, 1980.

Barry Bassis, New York City (The Legal Aid Society, of counsel), for petitioner-appellant.

Susan Picariello, Asst. Dist. Atty., Brooklyn, N. Y. (Eugene Gold, Dist. Atty., Kings County, Brooklyn, N. Y., of counsel), for respondent-appellee.

Before OAKES and GURFEIN, Circuit Judges, and PIERCE, District Judge.*

PIERCE, District Judge:

The appellant, a prisoner, appeals from the dismissal of his pro se application for a writ of habeas corpus by the District Court for the Eastern District of New York (Hon. Edward R. Neaher, *Judge*). Appellant was convicted of murder in the second degree after a jury trial in Supreme Court, Kings County. The conviction was affirmed by the Appellate Division, Second Department, without opinion, on December 13, 1976, and

---

* Honorable Lawrence W. Pierce, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

leave to appeal to the New York Court of Appeals was denied on January 24, 1977.

The habeas corpus proceeding was begun on April 5, 1977. The appellant's pro se application was dismissed by the District Court without a hearing by Memorandum Order dated September 14, 1978. In his petition, appellant contended that the trial judge engaged in biased conduct during the course of the trial, thereby depriving appellant of a fair trial. He also contended that the trial court erred when it denied his motion to suppress certain post-arrest statements made by appellant since he asserts he had not been properly informed of his constitutional rights prior to being interrogated.

Because we find that petitioner has not exhausted the state remedies available to him, we do not reach the merits of petitioner's claim. The decision of the court below is affirmed.

 The threshold issue presented here is whether the requirement of exhaustion of the remedies available in state court set forth in Title 28, United States Code, Section 2254(b), has been met by this appellant. See *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).[1]

There is no dispute that appellant, with the assistance of counsel, presented to the state appellate courts, *inter alia*, his claim that the conduct of the trial judge deprived him of a fair trial (p. 16, Point I, Brief for Defendant-Appellant, Appellate Division, Second Department) and his claim that his post-arrest statements should have been suppressed (p. 36, Point II). However, an examination of the appellant's brief in the Appellate Division reveals that federal constitutional claims, as such, were not raised in that court.[2] Such claims were expressly raised for the first time in the present petition for a writ of habeas corpus.

In *Johnson v. Metz*, 609 F.2d 1052, at 1054 (2d Cir. 1979), this Court, presented with similar circumstances, reaffirmed the standard applicable here, a standard enunciated by prior decisions with respect to the issue of exhaustion of state remedies in actions involving a variety of claims. In *Johnson*, the appellant had asserted a claim in the state appellate courts that the trial judge, by prejudicial conduct and constant interference, had denied appellant a fair and impartial trial. Appellant had not, however, expressly asserted a claim regarding his federal constitutional rights.

As stated therein by Judge Gurfein:

"The question of fair trial in relation to the overall conduct of the trial judge has in the past been stated in terms of either state law or the supervisory power of the particular court. In the absence of a claim of a federal *constitutional* violation, we must consider whether the New York appellate courts had a fair opportunity to consider the conduct of the trial judge in this case as violating fundamental rights guaranteed by the *federal Constitution*." *Id.*[3]

---

1. The question of exhaustion of remedies was not presented by the state's counsel and was not addressed by the District Court. However, the issue may be considered by this Court even if it was not raised in the District Court or by either party in this appeal. *Wilson v. Fogg*, 571 F.2d 91, 94 & n.5 (2d Cir. 1978); *United States ex rel. Johnson v. Vincent*, 507 F.2d 1309, 1312 (2d Cir. 1974), *cert. denied*, 420 U.S. 994, 95 S.Ct. 1435, 43 L.Ed.2d 678 (1975). We find that in spite of the failure of the state to raise the issue below, this Court should require strict compliance with the exhaustion doctrine in this case in the interest of comity particularly where the conduct of a state court trial judge has been questioned.

2. A passing comment in appellant's brief submitted to the Appellate Division to the "uncon- stitutionally conducted interrogation," was the only explicit reference by appellant concerning his *constitutional* rights in the entire forty-one page submission. This brief reference does not suffice to show that the state courts were presented "with the *same* claim [urged] upon the federal courts." *Picard v. Connor, supra*, 404 U.S. at p. 276, 92 S.Ct. at p. 512 (emphasis added).

3. Under section 470.15(3) of the New York Criminal Procedure Law, the state intermediate appellate court may reverse or modify a judgment as a *matter of discretion in the interest of justice*. The state appellate courts have reversed criminal convictions because of unwarranted intrusions of the trial judge during trial in the interest of justice and as a matter of

In *Johnson*, this Court found that considerations of "federalism . . . as a basis for the doctrine of exhaustion of state remedies [are] particularly cogent in cases such as this where the conduct of the state trial judge is at issue." *Id.* at 1055. The conclusion of the Court was that "[o]n the basis of precedent, therefore, the construction by this circuit of the meaning of the exhaustion doctrine leads us to conclude that the New York courts have never been given an opportunity to consider the really serious question of whether the pervasive conduct of the trial judge in this case . . . amounted to a violation of federal constitutional due process." *Id.* at 1055.

Presented with the same issue in the instant case, we similarly hold that the federal constitutional issues, raised as such by appellant for the first time in federal court, have not been presented to the state courts for appellate review and, therefore, appellant has failed to meet the exhaustion requirement of section 2254(b), Title 28, United States Code.[4] Therefore, we decline at this time to address the merits of petitioner's application.

Affirmed.

OAKES, Circuit Judge (dissenting):

With all respect I must dissent.

It seems to me this defendant's claim that he had been denied his right to a "fair trial" must be treated as equivalent to a claim that he had been denied due process of law. Certainly, the "original understanding" of "due process of law" embodies nothing if it does not embody the right to a fair trial. *See, e. g.,* L. Levy, *Origins of the Fifth Amendment* 164–70 (1968) (discussing the trial of John Udall in 1590).

More importantly, the New York courts themselves, regardless of what once may have been the case, now treat or should treat, a claim of denial of fair trial as synonymous with an assertion of constitutional due process rights. In *People v. Mees*, 47 N.Y.2d 997, 998, 420 N.Y.S.2d 214, 215, 394 N.E.2d 283, 284 (1979), the Court of Appeals stated that "appellant's claim that the intrusion of the Trial Judge deprived him of his constitutional right to a fair trial is not subject to harmless error analysis." And in *People v. Crimmins*, 36 N.Y.2d 230, 367 N.Y.S.2d 213, 326 N.E.2d 787 (1975), the court asserted:

[O]ur discussion of the effect to be given constitutional error [violation of the Fifth Amendment] should not overlook a parallel, and in some instances overlapping doctrine, *also of constitutional proportion*, namely, the right to a fair trial. Not only the individual defendant but the public at large is entitled to assurance that there shall be full observance and enforcement of the cardinal right of a defendant to a fair trial. The appellate courts have an overriding responsibility, never to be eschewed or lightly to be laid aside, to give that assurance. . . . The right to a fair trial is self-standing and proof of guilt, however[,] overwhelming, can never be permitted to negate this right.

*Id.* at 237–38, 326 N.E.2d at 791, 367 N.Y.S.2d at 218–19 (emphasis added). If the right to a fair trial were not "cardinal," *i. e.,* "of constitutional proportion," as stated in *Crimmins*, it could not be "self-standing," rendering harmless error analysis inapplicable.

The fact that at least some of the New York courts view a "fair trial" claim as a constitutional one is supported by numerous recent cases. *See People v. DeJesus*, 42 N.Y.2d 519, 523, 399 N.Y.S.2d 196, 198–99, 369 N.E.2d 752, 755 (1977) ("Neither the nature of our adversary system . . . nor the constitutional command to afford a fair trial inhibit a Trial Judge from assum-

---

discretion. *E. g., People v. Harrison,* 51 A.D.2d 589, 378 N.Y.S.2d 777 (2d Dep't 1976); *People v. Richburg,* 47 A.D.2d 909, 366 N.Y.S.2d 225 (2d Dep't 1975). Such discretionary determinations are apparently not dictated by constitutional considerations, but rather constitute exercises of the appellate court's supervisory powers.

4. For a discussion of unresolved issues relating to section 440.10(2)(c) of the New York Criminal Procedure Law, see *Johnson v. Metz, supra* at 1055–1056.

ing an active role in the resolution of the truth . . . .") (citations omitted); *People v. Bennett*, 65 A.D.2d 801, 801, 410 N.Y.S.2d 304, 305 (1978) ("The guarantee of a fair trial cannot be thus flouted, and even overwhelming proof of guilt cannot obviate the fundamental right to due process . . . .") (citation omitted); *People v. Brown*, 62 A.D.2d 715, 717, 405 N.Y.S.2d 691, 693 (1978) ("In our opinion the record is not so replete with error by the prosecutor and the court as to have denied defendant a fair trial under the Constitution.").

To be sure, there are many older New York cases that may be characterized as viewing the fair trial right as one growing out of the common law. *See, e. g., People v. Dovico*, 6 A.D.2d 457, 458, 179 N.Y.S.2d 379, 380 (1958) ("From the very beginning of the common law it has been recognized that a fair trial is one of the most basic and fundamental essentials of our judicial process and no matter how strong the evidence pointing to guilt a judgment of conviction must be reversed if the trial was not a fair one."). But even if the right is so viewed, it is no mere rule of housekeeping imposed by appellate courts; it is a common law rule so fundamental as to be embodied in the due process clauses of both the state and federal constitutions. U.S.Const. amends. V, XIV; N.Y. Const. art. I, § 6; *see Sharkey v. Thurston*, 268 N.Y. 123, 126, 196 N.E. 766, 767 (1935) ("It is a fundamental rule of our common law, embodied in the Constitutions of our State and Nation, that no person may be adjudged guilty and punished upon a charge of wrongful conduct without a hearing. . . . [N]o man may be both accuser and judge.").[1] And it is worth noting that the state and federal constitutions are in this respect identical in content. *See*

1. *Johnson v. Metz*, 609 F.2d 1052 at 1054 (2d Cir. 1979), a case that held the exhaustion doctrine applicable in a federal habeas case involving a claim of denial of fair trial, views these "common law" cases as holdings based solely on "state law" or "supervisory power." *Id.* Whether or not that view is correct, and concededly it may still have some support in the New York lower courts, though they do not discuss the point directly, *e. g., People v. Robinson*, 53 A.D.2d 898, 385 N.Y.S.2d 374 (1976);

*Central Savings Bank v. City of New York*, 280 N.Y. 9, 19 N.E.2d 659 (1939); *People v. Budd*, 117 N.Y. 1, 22 N.E. 670, 674 (1889), aff'd, 143 U.S. 517, 12 S.Ct. 468, 36 L.Ed. 247 (1892).

I do not see how a claim that a defendant has been deprived of a fair trial by excessive intrusion of the trial judge differs, for example, from a claim that he has been denied his constitutional rights when found guilty in the absence of proof beyond a reasonable doubt. Such a claim rests on the due process clause. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). So does the right to a fair trial. *Moore v. Dempsey*, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923).

On this basis, it seems to me that appellant's claim in the state courts that "[t]he trial judge's flagrantly biased conduct towards defense counsel, and his open attempt to assure a guilty verdict, deprived appellant of a fair trial" (Brief for Defendant-Appellant at 33, *People v. Gayle*, 55 A.D.2d 858, 390 N.Y.S.2d 768 (1976) (summary affirmance)) is a claim of denial of due process. Bias or partiality of the judge goes right to the core of due process. *Sharkey v. Thurston, supra; Frischling v. Schrank*, 24 A.D.2d 462, 463, 260 N.Y.S.2d 537, 538 (1965). To me, it adds nothing to a claim of denial of a fair trial to include the words "under the Due Process Clause" or "under the Constitution" or the like. The appellant's brief to the Appellate Division spoke of "a mockery of the right to a fair and impartial hearing." Brief for Defendant-Appellant, *supra*, at 35. It is difficult to understand the majority's argument that the court did not view this statement as raising due process issues. The uncontradicted affidavit of appellant's attorney states in part:

*People v. Harrison*, 51 A.D.2d 589, 378 N.Y. S.2d 777 (1976), the Court of Appeals seems to me to have clearly "constitutionalized" the fair trial right in New York. I do not feel bound by the *Johnson* case, not only because I think it misperceives New York law, but also because it was handed down many months after the argument in this case. I should also note that the point that I make here was evidently not presented to the *Johnson* court.

6. Following the denial of Mr. Gayle's appeal by the Appellate Division, I sought permission on his behalf to appeal to the New York State Court of Appeals. An oral hearing was held before Judge Jacob D. Fuchsberg.

7. Again, the issue of the evidence of Mr. Gayle's guilt was raised at said hearing, and again, I called the judge's attention to the fact that the errors involved were so serious that the question was one of whether Mr. Gayle's fundamental due process right to a fair and impartial hearing had been abridged, and that the evidence of his guilt was irrelevant to that issue.

Affidavit of Elliott Schnapp, November 9, 1979. I believe in short that appellant exhausted his state remedies.

Thus, I would go to the merits of his claim. And I would find it meritorious. Because of the outcome in this case, I will not include as complete a discussion of the merits as would be expected in a majority opinion, but a capsulation is necessary.

The prosecution's entire case rested on the following: the testimony of two eyewitnesses, Gayle's flight when apprehended, and his supposed oral confession to Detective Bankhead immediately after the apprehension. The defendant took the stand, gave an alibi, but produced no witnesses. One of the eyewitnesses (Jones) denied in his first statement that he was even at the party where the homicide took place, admitted on cross-examination that he had had five drinks of 150-proof Jamaican rum before he arrived at the party, and had bad eyesight in one eye. The other prosecution eyewitness (Foster) claimed that he did not discuss the case with anyone, including his cousin, Jones, until a couple of weeks before the trial, more than two and a half years after the killing. Tr. 401–03. Gayle's running upon apprehension was possibly explicable by the fact that he was an illegal alien and the apprehending detectives were in plain clothes. The detective's testimony as to a practically unsolicited, unwritten, unwitnessed confession, coupled with no inquiry as to motive, seems suspect on its face. The trial totally turned on credibility. The one piece of evidence that might have substantiated the eyewitnesses' version of the killing by demonstrating powder burns—the decedent Nune's clothing—was not produced even though one would assume it was kept as evidence. In such a case, the judge's role assumed great importance.

A close reading of the transcript indicates that the state court trial judge was all over this case like a tent. Examples provide a sense of his improper conduct, although only a full reading reveals the depth of his involvement. He did the following, none of which is perhaps alone reversible, but all of which operated in combination to be excessively intrusive:

1. The judge interfered constantly in the trial, e. g., Tr. 159–61, 171–73, 312–14, 331–35, 397.[2]

2. The following exchange is a typical example:

MR. GALIAN [defense counsel]: May I have the last question and answer read?

THE COURT: No, not read. The witness said the man with the gun, the man who fired the shots after Dennis, the deceased, who was on the ground, went out into the street, he held his right arm forward, simulating the action of the man who went out. There was a gun in his hand. He hailed the taxicab.

THE WITNESS: Yes, sir.

THE COURT: He stopped the cab.

THE WITNESS: Yes, sir.

THE COURT: You want to know what happened then.

MR. GALIAN: Yes, sir.

THE COURT: What happened then?

THE WITNESS: Two guys put Dennis on the back seat of the taxi and gave the taxi man instructions to take him to the hospital.

THE COURT: What did the taxi man do?

THE WITNESS: He was panicking, and he didn't know which way to turn.

THE COURT: Did he stop the car?

THE WITNESS: Yes, the car was stopped in the middle of the road, and he had—Dennis was on the back seat, and he said somebody had to come with him, and things like that.

THE COURT: What did he do? Did he sit in the car and wait for the police to come, or leave?

THE WITNESS: I think he moved the car about ten feet, and stopped there.

THE COURT: Go ahead.

Tr. 331–32.

2. The judge was rough on defense counsel when he objected or disputed a ruling, e.g., Tr. 154–55, 156, 210–13, 631–32, 640, 671, 686–87, while being easy on the prosecutor in comparable circumstances, e. g., Tr. 233, 278, 311, 341.[3] While he displayed displeasure over the amount of cross-examination time taken by defense counsel. Tr. 327–28, the judge himself took an inordinate amount of time in asking questions, e. g., Tr. 331–32.

3. The judge leapt to the aid of the prosecution witnesses, for example, in the examination of witness David Jones, e. g., Tr. 270–71, 280–81, 287–88, 290, 291, 294, 296, 301, 307, 312, 333, 334, 335, 359–60, 361–62,[4] in so doing interfering unduly with cross-examination.

4. The judge took over cross-examination of the defendant and tried to make him look like a liar. Examples include the issue of defendant's "sister's" address when in fact Gayle may have misunderstood the judge's questions because of a date mix-up,

Tr. 681, 691–92, 710, 936, or something as trivial as whether the police permitted defendant to go to the bathroom, Tr. 682–83. The judge also registered his disbelief by making the defendant look ridiculous: "Did you go swimming on that day [January 2] with Beverly?" Tr. 647.

5. The judge joined with the prosecution on several occasions to gang up on the defense. E.g., Tr. 341 (Prosecutor: "Judge, can we recess until Thursday and put an end to my patience?"); Tr. 725 (The Court: "Members of the jury, the defendant asks for another adjournment."); see also Tr. 348, 369, 399, 671, 703–05, 707, 708.

6. After the prosecutor's inappropriate comment in reference to defense counsel (Prosecutor: "If he wants to neigh, we have zoos," Tr. 278), the judge himself contributed to such denigration by referring to Rastafarians as "animals," Tr. 686. The judge later acted inconsistently by telling defense counsel he could interrupt the prosecutor's summation, Tr. 840, then chiding

---

3. The following excerpts demonstrate this disparity of treatment. Compare

MR. GALIAN [defense counsel]: Objection to form, your Honor. Leading. That's all leading.

THE COURT: Counselor, you must rise to your feet when you address the Court.

MR. GALIAN: I'm sorry, your Honor.

THE COURT: This is not a real estate closing.

MR. GALIAN: I'm sorry, your Honor.

THE COURT: The objection is overruled. Just make an objection without comment. I will rule on that.

Go ahead.

Tr. 156, with

Q. Now, at one-thirty in the morning, the people had been drinking all evening?

MR. ROSENBAUM [prosecutor]: That's objected to. There is no such testimony.

THE COURT: Yes, you are starting an argument there. This is purely argumentative, and that's obvious from the language in your question, up to the point where the objection was made.

Go ahead.

Tr. 311.

4. The following exchange dealt with the important issue of the witness's eyesight:

Q. Now, would you tell us the nature of your eye condition that requires you to wear glasses at this time?

A. (No response.)

Q. Are you nearsighted?

THE COURT: Just a moment. That required you to wear glasses—

MR. GALIAN: At this time.

THE COURT: Why do you have to wear glasses now?

THE WITNESS: I have a defect with my left eye.

THE COURT: Were you able to see that night without your glasses?

THE WITNESS: I just started wearing glasses two months.

THE COURT: You never used to wear glasses?

THE WITNESS: No, sir.

THE COURT: Was your eyesight all right?

THE WITNESS: Yes, sir.

* * * * * *

THE COURT: You were a welder?

THE WITNESS: Yes, sir.

THE COURT: You didn't have glasses then in 1972?

THE WITNESS: No, sir.

THE COURT: That didn't interfere with your work, did it?

THE WITNESS: No, sir.

THE COURT: You were able to do a welding job?

THE WITNESS: Yes, sir.

THE COURT: That requires good eyesight, does it not?

THE WITNESS: It does.

Tr. 287–88, 290.

him for doing so, Tr. 881, a turnaround that could only serve to make defense counsel look foolish in front of the jury.

A reading of the entire record does not produce any explanation as to why the judge comported himself in this manner. Defense counsel was perhaps not a Max Steuer on cross-examination, but he was, with one or two possible exceptions, and those provoked, polite and restrained when faced with a hostile judge. Furthermore, he did bring out a number of discrepancies or holes in the prosecution case. He certainly did not "fuel" the trial court's treatment of him, as did defense counsel in *United States v. Boatner*, 478 F.2d 737 (2d Cir.), *cert. denied*, 414 U.S. 848, 94 S.Ct. 136, 38 L.Ed.2d 96 (1973).

This judge was not as partial as the trial judge in the "Chicago Seven" case, *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). But he was on a par with the trial judge in *United States v. Nazzaro*, 472 F.2d 302 (2nd Cir. 1973), where the panel said:

> There is no dispute among the parties that the judge participated extensively in the examination of all witnesses. Several such instances, however, occurred only "where [it was] necessary to clarify testimony and assist the jury in understanding the evidence," *United States v. DeSisto*, 289 F.2d 833, 834 (2nd Cir. 1961). But "while it might be proper for a judge to question witnesses to clarify issues, such intervention should not become the rule." *United States v. D'Anna*, 450 F.2d 1201, 1206 (2nd Cir. 1971). It is clear from the record that on frequent occasions during the trial of this case, the judge's questions unmistakably rehabilitated a prosecution witness whose credibility had been undermined by defense counsel. At other times, the court's questions appeared designed to inject doubt or uncertainty as to the credibility of a defense witness.

*Id.* at 307 (footnote omitted). Again,

> There were numerous similar occasions in which the judge came all too quickly to the aid of a prosecution witness during cross-examination. The impact of these instances was such that the jury could only believe that the judge favored the government's witness and his version of the facts.
>
> Even more damaging was the judge's persistent questioning of defense witnesses, particularly the defendant Nazzaro himself. The trial judge often assumed the prosecutor's role, interposing questions which clearly indicated disbelief in the defendant's testimony.

*Id.* at 308. And again,

> Where the defendant's guilt or innocence rests almost exclusively on the jury's evaluation of the witnesses' demeanor and credibility, we cannot ignore questioning undertaken by a judge which so clearly signals to the jury the judge's partisanship. Even if a judge's interjections are not motivated by a partisan purpose, "he must not . . . permit even the appearance of such an interference." *United States v. Curcio*, 279 F.2d 681, 682 (2nd Cir. 1960). The court's vigorous participation in examining Nazzaro and Reynolds, especially when contrasted with the relative freedom from hostile interruption of the prosecution's witnesses, could not avoid conveying to the jury that the judge did not believe Nazzaro and the other defense witnesses.

*Id.* at 310 (footnote omitted). True, the witnesses Jones and Foster, as well as the defendant Gayle, spoke in a Jamaican patois and were sometimes difficult to hear. But only a small part of the judge's interference was for clarification purposes.

A fair trial is a fair trial. The defendant here was perhaps not as badly off as the defendant in *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152 (2nd Cir. 1973), as to whom there were overt expressions of racism. But he still did not have a fair trial. I consider the conduct of the state trial judge here at least as intrusive as that condemned by the New York Court of Appeals in *People v. Mees, supra*.

In short, I would reverse the district court and grant the writ of habeas corpus,

**28**

subject to a retrial within sixty days of our mandate.