Keith GAYLE, Petitioner-Appellant,

v.

Charles SCULLY, Superintendent, Green Haven Correctional Facility, Respondent-Appellee.

No. 846, Docket 84–2374.

United States Court of Appeals, Second Circuit.

Argued Feb. 26, 1985.

Decided Dec. 12, 1985.

---

Barry Bassis, New York City (Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for petitioner-appellant.

Shulamit Rosenblum, Brooklyn, N.Y. (Elizabeth Holtzman, Dist. Atty., Barbara

*denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965).

D. Underwood, Asst. Dist. Atty., Kings County, N.Y., of counsel), for respondent-appellee.

Before OAKES, MESKILL and PIERCE, Circuit Judges.

PIERCE, Circuit Judge.

Whether conduct by a judge in a state court criminal trial is sufficiently excessive to constitute a violation of the federal constitutional right to a fair trial is the issue presented here. Clearly, the fundamental right to a fair trial rests at the epicenter of our broad array of due process rights, thus, a most scrupulous review of the events which occurred in the challenged criminal trial is required of us. Principles of fundamental fairness represent the constitutional litmus test we must apply; concurrently, principles of comity and federalism warrant our respectful attention. Our review leads us to conclude that the determination by the district court denying the petition for a writ of habeas corpus should be affirmed.

## BACKGROUND

*Procedural History*

On April 23, 1974, petitioner Gayle was indicted in Kings County, State of New York, for the murder of one Dennis Nunes on January 2, 1972. He was tried by a jury before a Justice of the New York State Supreme Court, Kings County. The jury found Gayle guilty of Murder in the Second Degree, and on October 28, 1974 he was sentenced to a prison term of twenty-five years to life. The Appellate Division, Second Department, affirmed the conviction without opinion on December 13, 1976. *People v. Gayle*, 55 A.D.2d 858, 390 N.Y. S.2d 768 (2d Dept.1976). On January 24, 1977, leave to appeal to the New York Court of Appeals was denied.

In April of 1977, Gayle filed a petition in the United States District Court for the Eastern District of New York seeking a writ of habeas corpus; he claimed that the trial judge's conduct had been so biased that it denied him a fair trial and thereby deprived him of liberty without due process of law. On September 14, 1978, the district court (Neaher, *Judge*), ruling on the merits, denied Gayle's petition. On appeal, this court did not address the substance of petitioner's claim. Following *Johnson v. Metz*, 609 F.2d 1052 (2d Cir.1979) (Gurfein, J.), we held that Gayle had not exhausted his state remedies adequately because in his state appeal he had failed to identify his claim of denial of fair trial based on judicial bias as asserting the denial of a federal constitutional right. Accordingly, we affirmed the denial of the petition. *Gayle v. LeFevre*, 613 F.2d 21, 22–23 (2d Cir.1980) (Pierce, J.) (Oakes, J., dissenting).

Gayle returned to the New York courts and sought to exhaust state remedies. On January 15, 1980, he moved in the Appellate Division, Second Department, to have that court amend its December 13, 1976 ruling to include a statement that the court had considered and rejected his claim that the trial judge's conduct had deprived him of his rights under the fourteenth amendment of the United States Constitution. The Appellate Division denied this motion without opinion on March 31, 1980. Thereafter, on March 6, 1981, in Supreme Court, Kings County, Gayle filed a motion to vacate his conviction pursuant to N.Y. Crim. Proc. Law § 440.10(1)(h) (McKinney 1983). In support of this motion, Gayle alleged in an affidavit that the state trial judge's bias had deprived him of his rights under the fourteenth amendment. On October 2, 1981, the Supreme Court denied this motion pursuant to N.Y. Crim. Proc. Law § 440.-10(2)(c), which mandates denial of a § 440.-10 motion raising any issue that the movant unjustifiably failed to raise on his direct appeal. On April 20, 1982, the Appellate Division, Second Department, denied Gayle leave to appeal.

On September 30, 1982, Gayle filed the instant habeas petition in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 2254. Reviewing this petition, Judge Bramwell ruled that under the "relaxed exhaustion standards set forth in *Daye v. Attorney*

*General,* 696 F.2d 186 (2d Cir.1982) (en banc) (Daye II)"—which was decided after, and effectively overruled, *Johnson v. Metz* and *Gayle v. LeFevre*—Gayle had sufficiently identified his claim of denial of a federal constitutional right in his direct state appeal, and that he had exhausted his state remedies sufficiently to pursue his habeas application in federal court. Then, addressing the merits of Gayle's application, the district judge found that "although the trial judge's conduct may have approached the constitutional limit of fundamental fairness, the petitioner herein was not denied a fundamentally fair trial."

*The Trial*

At Gayle's state trial for murder, the prosecution presented evidence from which the jury could have found the following: On January 2, 1972, at approximately 1:00 a.m., at a party on the first floor of an abandoned house at 666 St. Marks Avenue in Brooklyn, Gayle approached Dennis Nunes and greeted him; Gayle walked a few steps with Nunes and then drew a small automatic handgun, placed it at Nunes' stomach, fired one shot, and fled; Nunes fell to the floor; minutes later, another man came down the stairs of the house and fired a gun at Nunes but did not hit him.

The prosecution's major witnesses were as follows:

1) Royston Foster and David Jones

David Jones and his cousin, Royston Foster, testified that: At approximately 10:00 p.m. on January 1, 1972, they arrived at the party at 666 St. Marks Avenue; Jones and Foster had provided the stereo equipment being used at the party and were tending the records; sometime after midnight, a man wearing a dark coat walked up to Dennis Nunes, who was standing a few feet from Jones and Foster, put his arm around Nunes, and, according to Jones, said "What happened, Den-Den?" (Foster heard no conversation); the two men then walked together into an adjoining unlit room where the man in the dark coat took a gun from his waist and fired a single shot

into Nunes' torso; within a few moments, another man came down the stairs of the building, stopped several feet from Nunes—who had fallen to the floor—and fired two shots; neither of these two bullets hit Nunes; Jones and Foster both identified Gayle as the man in the dark coat who had fired the shot that struck Nunes.

On cross-examination, Jones stated that he had never seen Gayle either before or after Nunes' murder; that he had consumed seven alcoholic drinks, including five of 150 proof rum, before arriving at the party; and that, though several months prior to that night an "eye doctor" had prescribed glasses for him, he had not at that time obtained glasses. Jones also stated that, when questioned by police at the scene of the crime, he had denied seeing anything and had told them he arrived at the party after the murder had taken place. On cross-examination, Foster stated that he had seen Gayle numerous times before the night of the party—though the two had never met—and that he had not discussed the shooting with his cousin, Jones, at any time during the two years between that event and the trial.

2) John O'Malley

Officer John O'Malley of the New York City Police Department (NYPD) was one of the first officers to arrive at the scene of Nunes' murder. O'Malley testified that, as he arrived, he observed Nunes' body outside the house. Inside the house, on the first floor, O'Malley found a single spent .25 caliber cartridge but no other evidence of any crime.

3) Reuben Bankhead

Detective Reuben Bankhead was a member of the NYPD's investigative team that responded to the report of Nunes' murder. Bankhead testified that he discovered bloodstains on the floor of the apartment where Nunes was shot. Detective Bankhead also testified that he had questioned Gayle shortly after his arrest and that after being informed of his constitutional rights, Gayle made a statement confessing

to Nunes' murder. Detective Bankhead testified that he took no notes during this confession, made no record of it later, and no witnesses were present in the squad room at that time.

### 4) Harold Sperling

Detective Harold Sperling testified that he was a member of the "apprehension team" charged with finding the appellant. On April 23, 1973, Sperling and his partner, Detective Booze, both of the NYPD, saw appellant in the vicinity of Decatur Street and Broadway in Brooklyn. Sperling testified that he and his partner approached appellant, identified themselves as police officers, and asked him if he was Keith Gayle. Sperling further testified that appellant answered in the negative, and when Detective Booze attempted to handcuff him, he fled. The detectives gave chase and apprehended Gayle.

### 5) Dominick DeMaio

Dr. Dominick DeMaio, the medical examiner who performed the autopsy on Dennis Nunes' body, testified that Dennis Nunes had been killed by a single .25 caliber bullet which extensively damaged his internal organs. DeMaio further testified that the wound would have caused little external bleeding and that the entry showed no evidence of the powder burns that are normally present when a wound is caused by a bullet fired at close range. However, Dr. DeMaio stated that the powder might have been filtered out by the victim's clothes. (Nunes' clothes had been removed before Dr. DeMaio examined the body and apparently were not made available to him.)

In addition, the prosecution introduced an exculpatory statement made by Gayle to an assistant district attorney shortly after he allegedly confessed to Detective Bankhead. In this statement, Gayle said that he was at his sister's apartment at the time of Nunes' murder.

Gayle testified in his defense that, at the time in question, he had been at a small gathering of friends at his sister's apartment at New York Avenue and St. Johns Place in Brooklyn. He further testified that at the time of his apprehension the two detectives failed to identify themselves and that he had been afraid of the authorities because he was an illegal alien. He denied giving any confession to Detective Bankhead.

### DISCUSSION

We do not sit in this case to assess the sufficiency of the state's evidence as such nor to express any view as to whether Gayle was guilty or not guilty of the crime charged. The issue presented to us is whether the appellant was denied his federal constitutional right to a fair trial due to apparent bias on the part of the state trial judge.[1]

Pursuant to the fifth and fourteenth amendments, it is axiomatic that all criminal trials must be conducted within the bounds of fundamental fairness. *See Taylor v. Hayes*, 418 U.S. 488, 501–02, 94 S.Ct. 2697, 2704–05, 41 L.Ed.2d 897 (1974); *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); *Mayberry v. Pennsylvania*, 400 U.S. 455, 465, 91 S.Ct. 499, 504, 27 L.Ed.2d 532 (1971); *Rochin v. California*, 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed.2d 183 (1952); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). This Circuit's standards for determining whether that right has been abridged by virtue of the bias of a state trial judge are set forth in *Daye v.*

---

1. The appellee raises the question whether Gayle has sufficiently exhausted state remedies as 28 U.S.C. § 2254(b) requires. As noted earlier, Judge Bramwell held that, under the standards of *Daye II*, 696 F.2d 186, Gayle sufficiently identified his claim of denial of federal right in his original state appeal. Thus, he exhausted his state remedies when the New York Court of Appeals denied leave to appeal on January 24, 1977. The State does not contest the district judge's ruling directly but argues instead that we should reconsider *Daye II*. Addressing this point, we need only note that the arguments which the State raises were considered and rejected by the *en banc* Court in *Daye II*. Accordingly, we affirm Judge Bramwell's holding that Gayle has exhausted his state remedies sufficiently with respect to his present federal claim.

*Attorney General,* 712 F.2d 1566 (2d Cir. 1983) (Daye III), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984) and *Johnson v. Scully,* 727 F.2d 222 (2d Cir.1984).[2] As was noted in the latter case, these standards are "somewhat ill-defined," *id.* at 226, however, the concerns which the standards address are clear. First, as stated in *Daye III,* the bias of a trial judge:

> creates a risk that the jury will be deflected from a conscientious discharge of their responsibility to find the facts, apply the law, and reach a fair verdict. The jurors may believe that they should shade their judgment to accommodate the judge's view of the defendant's guilt, perhaps deferring to his view in a close case. Second, even if the jurors are not swayed from an independent discharge of their solemn responsibilities, the judge's [action] creates a risk that the trial will not be perceived by the defendant or the public as a fair adjudication of guilt or innocence, presided over by a neutral magistrate obliged to deal evenhandedly between the contending forces of the prosecution and the defense.

712 F.2d at 1571–72; *see also Johnson v. Scully,* 727 F.2d at 226.

It is clear that a judge does not deny a defendant due process of law by merely intervening in a trial to question witnesses. Further, it is abundantly clear that only infrequently does intervention by a trial judge rise to the level of a due process violation. *Daye III,* 712 F.2d at 1572; *Johnson v. Scully,* 727 F.2d at 226. We are cognizant that:

> A trial judge in [a] criminal ... cas[e], may, indeed must, be more than a mere moderator or umpire in a contest between two parties in an arena before him. He should take part where necessary to clarify testimony and assist the jury in understanding the evidence....

*United States v. De Sisto,* 289 F.2d 833, 834 (2d Cir.1961). Nor does the mere occurrence of adverse questioning violate a defendant's constitutional rights: "[E]ven the most neutrally framed questions, asked solely for clarification, may elicit answers devastating to the defendant. Moreover, a trial is not rendered constitutionally unfair every time a trial judge asks a question obviously intended to permit a witness to emphasize testimony helpful to the prosecution or clearly designed to challenge testimony favorable to the defense." *Daye III,* 712 F.2d at 1572. The judge's intervention in the conduct of a trial must be both significant and adverse to the defense "to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceed[s] constitutional limits." *Id.* Thus, a petitioner claiming that a judge's bias deprived him of a fair trial faces a difficult task. As the dispositions of both *Johnson v. Scully* and *Daye III* demonstrate, a federal court will not lightly intervene when such a claim is asserted. However, "we recognize that some point exists beyond which the quantity and nature of a trial judge's questioning renders a trial unfair in the constitutional sense." *Id.* at 1572. Having carefully reviewed the nearly 1000 pages of the trial transcript herein, we conclude that the trial judge in this case did not pass this point.

It is the contention of appellant that throughout appellant's trial, the judge repeatedly displayed obvious partiality toward the prosecution and bias against the defense in the presence of the jury by ridiculing defense counsel and berating him for pressing objections; constantly interrupting defense counsel's cross-examination of prosecution witnesses—interfering with his efforts to present a coherent defense—while almost invariably allowing the prosecutor a free hand; intervening often to rehabilitate prosecution witnesses whose credibility had been called into question and to elicit repetition of testimony favorable to the prosecution; at several points

---

**2.** Petitioner in *Johnson v. Scully* was the same petitioner who sought habeas relief in *Johnson v. Metz,* 609 F.2d 1052 (2d Cir.1979).

offering unrequested instructions to the jury to minimize problems with the prosecution's proof; taking over the examination during appellant's testimony in his own defense; and making clear to the jury his disbelief of Gayle's testimony.

The appellee contends that by focusing on the trial judge's alleged improprieties the defense attorney's "irritating and contumacious behavior" is ignored; the suggestion that the court's explanations and directives to counsel were unwarranted reprimands is a mischaracterization; the rulings and admonitions to counsel and the court's participation in questioning witnesses were necessary to guide counsel, to ensure the orderly progress of the trial, and to ensure that the jury heard and understood all the "essential testimony"; and, finally, the court's charge was legally correct and fairly summarized the evidence in the case.

The appellee all but concedes that the trial judge's intervention in this case was extensive, but argues that the risk that the defendant, the jury, and the public will not perceive the trial as fair arises when judicial intervention—other than an explicit expression to the jury of the court's opinion that a defendant is guilty—is not merely extensive but also is adverse to the defendant to a substantial degree. *See Daye III,* 712 F.2d at 1572. Gayle does not contend that at any point the trial judge explicitly stated that in his opinion he believed appellant to be guilty. Appellee argues, and indeed it appears to be so, that the degree of judicial intervention in this case was far less extensive than that of the trial court in

*Johnson v. Scully,* 563 F.Supp. 851 (E.D.N. Y.1983), *rev'd,* 727 F.2d 222 (2d Cir.1984), which we found not to have exceeded constitutional bounds.

As discussed herein below, the judge's intervention in this case, while frequent, in our view was not substantially adverse to appellant to the point of exceeding constitutional bounds.

A review of the trial transcript reveals that frequently statements were made by the trial judge which may be described as caustic and sometimes sarcastic—still other comments were gratuitous and might have been better left unsaid. *See, e.g.,* Tr. at 160 (where a police officer had testified several times that he did not write down the names of witnesses, the judge stated: "You want him to testify to that again? Say it again, please."); *id.* at 210–14 (after defense counsel asks arresting officer whether he considered reading the *Miranda* rights to be a foolhardy gesture, the judge responded: "We couldn't care less in this courtroom about the detectives's opinion or yours or mine or the district attorney's.... It is the law [Counsellor], that a suspect or a defendant be advised of his rights.... What [the detective's] opinion is of it, we are not concerned with that at all."); *id.* at 706 ("Do you understand that question yourself?"); *id.* at 156 ("Counsellor, you must rise to your feet when you address the court.... This is not a real estate closing."); *id.* at 255 ("Excuse me [Counsellor], please don't adopt an air of despair"—upon overruling a defense objection).[3]

---

3. Also, the court allegedly parodied defense counsel's questions testing the memory of a prosecution witness:

Q And what did you do after you left the building? Get in your car?
A Yes, sir.
Q And where did you proceed to go?
A Brooklyn Jewish Hospital.
Q Who was driving?
The Court: Is this after—
Defense: After the search.
The Court: After the investigation he made?
Defense: Yes, your Honor.
The Court: Is this in his own car?
Defense: Yes, sir.

The Court: Does it make any difference who was driving, [Counsellor]?
Defense: It might, your Honor.
The Court: All right, who was driving?
The Witness: I do not recall, your Honor.
The Court: Was this a right-hand drive or a left-hand drive?
The Witness: Left-hand drive.
The Court: Standard shift?
The Witness: Automatic.

\* \* \* \* \* \*

Q And when you arrived, did you see the body of Nunes?
A Yes, sir, I did.

Appellant urges us to contrast these statements with the judge's banter with the prosecutor, *see, e.g., id.* at 122–23 (upon adjourning court on Friday afternoon, the judge stated, "[Jurors,] [y]ou must be tired. I know these two elderly gentlemen down here [presumably counsel] are tired. Well, I always say, Mr. District Attorney, I have youth on my side and—"; the prosecutor replied, "Which side?"; to which the judge responded, "All right, we won't answer that"); *id.* at 194 (while waiting for a state witness, the prosecutor stated to the judge "I will have a witness for you when he walks over from the Municipal Building"; the judge replied, "I have always maintained it is a long walk from the Municipal Building"; the prosecutor responded, "Maybe he will take the IRT"; to which the judge replied, "It's too long, about half a long block.").[4]

Appellant contends that much of the court's questioning of witnesses seemed intended to bolster the prosecution's case. For example, as the defense questioned Detective Sperling, the judge interrupted to

> Q And where was it with respect to the hospital or the emergency ward of the hospital?
> THE COURT: What do you mean by that? Was that on a chair, was it on the floor, was it on a bed? Is that what you want to know?
> DEFENSE: I want to know if it was in a private room in the ward.
> THE COURT: Do they have private rooms in the emergency portions?
> THE WITNESS: No, sir, they have—
> THE COURT: This was in the emergency room you saw the body?
> THE WITNESS: Yes, sir.
> DEFENSE: That's what I want him to tell me.
> THE COURT: He has told us, [Counsellor], in the emergency room.
> Tr. at 184–85, 186–87.

4. In questioning the medical examiner, the following exchange occurred: at Tr. 417–18:
> BY PROSECUTOR:
> Q Are you a physician duly licensed to practice medicine in the City of New York?
> A Yes.
> THE COURT: I was not getting free medical advice.
> THE WITNESS: Not mine.
> PROSECUTOR: He promises that any member of the judiciary at present rates must send a fee in.

elicit repetition of Sperling's earlier testimony that Gayle had fled upon apprehension. *Id.* at 207–08. At another point, the court asked several questions of David Jones, causing the witness to repeat that he had seen Gayle place the gun "right up close" to the victim. *Id.* at 376.[5] *See also id.* at 411 (court elicits repetition of Foster's identification of Gayle); *id.* at 412 (court elicits repetition of Foster's testimony that he had seen Gayle "[m]any places before" the night of Nunes' murder); *id.* at 414–15 (same).

On cross-examination, defense counsel elicited from David Jones, one of the alleged eyewitnesses to the murder, that on the night in question, he had had at least seven alcoholic drinks—five of which were 150 proof rum—and that he had an uncorrected vision defect at that time. Defense counsel also introduced the witness' statement, made on the night of the murder, in which he denied any knowledge of the crime. Following this attack on Jones' credibility, the court questioned Jones re-

> THE WITNESS: What did he say?
> THE COURT: He said something about fees for all this free advice.
> THE WITNESS: It's on the cuff.

5. Later while Royston Foster testified, the court elicited restatements that the victim's body had fallen at a location only three feet from the witness.
> Tr. at 417–18.
> BY PROSECUTOR:
> Q What happened to Dennis Nunes then? A He fell beside a speaker box.
> THE COURT: He what?
> THE WITNESS: He fell beside a speaker box.
> THE COURT: Right there?
> THE WITNESS: Yeah.
> THE COURT: Beside the speaker?
> THE WITNESS: Yes.
> THE COURT: How far away was that from you?
> THE WITNESS: About three feet.
> THE COURT: What?
> THE WITNESS: About three feet away.
> THE COURT: Three feet away?
> THE WITNESS: Yes.
> THE COURT: He fell right down there?
> THE WITNESS: Yeah, in front of the speaker.
> THE COURT: In front of the spake [sic]?
> THE WITNESS: Yes.
> THE COURT: Go ahead.
> Tr. at 390.

garding inconsistent statements given before and after the murder.[6]

At another point, when Jones testified that at the time of the murder, he had been employed as a welder, the court interjected:

THE COURT: You were able to do a welding job?

**6.** BY DEFENSE COUNSEL:

Q I see. And the facts that you [Jones] told Assistant D.A. Paul Zsufa differ from the facts that you told the jury and the Court last Monday, is that not true?
THE COURT: That's what he said.
DEFENSE: I beg your pardon?
THE COURT: That's what he said. The first statement you made was right after the shooting, you went to the station house—
THE WITNESS: Yes, sir.
THE COURT: —and you were there questioned by Assistant District Attorney Zsufa?
THE WITNESS: Yes.
THE COURT: You made a statement?
THE WITNESS: Yes, sir.
THE COURT: The questions read to you and the answers, you said you were asked those questions and made those answers, but that those answers were not true?
THE WITNESS: That's correct.
THE COURT: The next day, or on a Sunday, after that, Detective Bankhead spoke to you?
THE WITNESS: Yes.
THE COURT: And then you made a statement to Detective Bankhead?
THE WITNESS: That's correct.
THE COURT: He talked to you and you·answered his questions?
THE WITNESS: That's correct.
THE COURT: Those answers which you gave to Detective Bankhead, were different from those you gave the Assistant District Attorney?
THE WITNESS: The answers I gave to Detective Bankhead was the truth.
THE COURT: Was the truth?
THE WITNESS: Yes, sir.
THE COURT: That was the second questioning?
THE WITNESS: Yes, sir.

Tr. at 365–66

**7.** BY DEFENSE COUNSEL:
Q Now, would you tell us the nature of your eye condition that requires you to wear glasses at this time?
A (No response.)
Q Are you nearsighted?
THE COURT: Just a moment. That required you to wear glasses—
DEFENSE: At this time.
THE COURT: Why do you have to wear glasses now?

THE WITNESS: Yes, sir.
THE COURT: That requires good eyesight, does it not?
THE WITNESS: It does.

*Id.* at 290. The court interrupted Jones' cross-examination with several questions relating to Jones' eyesight.[7]

THE WITNESS: I have a defect with my left eye.
THE COURT: Were you able to see that night without your glasses?
THE WITNESS: I just started wearing glasses two months.
THE COURT: You never used to wear glasses?
THE WITNESS: No, sir.
THE COURT: Was your eyesight all right?
THE WITNESS: Yes, sir.
Q When did you start wearing glasses, Mr. Jones?
A About two months ago.
Q And before you started to wear glasses two month ago, did you feel that there was something you were missing by reason of not having glasses, that you weren't seeing as well as you used to, say, let's say five years ago?
THE COURT: He's talking about two months ago, just before you started to wear glasses.
THE WITNESS: Yes, sir.
Q You felt that there was something deficient in your eyesight two, three months ago, is that correct?
A Yes, sir.
Tr. at 287–88.
BY DEFENSE COUNSEL:
Q Now, for how long before you got these glasses did you feel that your eyesight was less than perfect, less than it used to be, let's say?
A I'd say about three years ago.
Q But you didn't take any steps to correct your vision three years ago?
A Yeah, I used to get eye drops from a doctor.
Q Anything else?
A Nor, sir. He ordered glasses for me, but I didn't pay it no mind.
Q I see. Is it necessary that you have perfect vision on your job, Mr. Jones?
A Yes, sir.
Q Did your employer have anything to do with your obtaining glasses subsequently?
A No, sir.
Q He didn't tell you to wear glasses?
A No, sir. I just started working for this company about two months now.
Q At that time in April—January of 1972, who were you working for?
A I was with Seatrain, Brooklyn Navy Yard.
Q What were you doing there?
A Welding.
Q Welding?

Appellant claims that the trial judge openly displayed disbelief of Gayle's testimony. For example, when defense counsel elicited from Gayle that, on the date of his arrest, he had told an assistant district attorney that, on the night of Nunes' murder, he had been at home with his sister-in-law and a small group of friends, the court interrupted:

THE COURT: This was on the day of the arrest on April 13, 1973?

[Witness Gayle]: That's when—

THE COURT: In the stationhouse?

THE WITNESS: Yeah.

THE COURT: And they asked you where you were?

THE WITNESS: Yeah.

THE COURT: A year and three months earlier?

THE WITNESS: Yeah.

THE COURT: On January 2nd?

THE WITNESS: Right.

THE COURT: And you said you were at your sister's?

A Yes, sir.
Q Well, in the welding—
THE COURT: You were a welder?
THE WITNESS: Yes, sir.
THE COURT: You didn't have glasses then in 1972?
THE WITNESS: No, sir.
THE COURT: That didn't interfere with your work, did it?
THE WITNESS: No, sir.
THE COURT: You were able to do a welding job?
THE WITNESS: Yes, sir.
THE COURT: That requires good eyesight, does it not?
THE WITNESS: It does.
Q In the welding process, you are required to wear protective eye—
A Yes.
Q —a spectacle?
A A shield with glass.
Q A shield, I'm sorry. And you did wear it at that time?
A I beg your pardon?
Q You did wear a shield while you were working as a welder?
A Yes.
Q How long did you work there as a welder?
A Prior to '72, I would say about six months.
Q All right, so you worked there for six months. Now, did your eyesight—was your

THE WITNESS: Yes, sir.

THE COURT: Go ahead.

*Id.* at 589.

The trial judge's inquiry as to Gayle's ability to recall his whereabouts on a specific night more than a year later was somewhat disingenuous since the court had already questioned Gayle regarding this matter at an earlier hearing to determine whether his alleged confession would be admitted:

THE COURT: You remembered a year and a half before where you were that night?

[Witness Gayle]: It was a holiday. I just come to this country, sir, so it was my second holiday in America, so quite obvious, I remember that date.

THE COURT: I see.

*Id.* at 87.

At another point in his testimony on direct examination, appellant testified that around midday on the day of the murder, he had gone with one Beverly, a friend of

eyesight affected in any way by reason of your being a welder?
A The doctor didn't give me a diagnosis that it was from being a welder.
THE COURT: No. Did you feel that you were seeing all right while you were a welder and after you started work as a welder?
THE WITNESS: Yes, sir.
THE COURT: Were you able to see all right?
THE WITNESS: Yes, sir. You see I only have problems with my left eye. My right eye is 20–20.
Q So that the glasses you were wearing now are perfect on one side, are clear glass on one side?
A (Witness nods head.)
Q And it's on your left eye?
THE COURT: No glasses are intended to help your vision in one eye; the other—
THE WITNESS: Perfect.
THE COURT: You say perfect?
THE WITNESS: Yes, twenty-twenty.
*Id.* at 289–92.

\* \* \* \* \* \*

THE COURT: You say the right eye was perfect, 20–20 vision?
THE WITNESS: Yes, sir.
THE COURT: Were you able to see even if you closed your left eye?
THE WITNESS: Surely.
THE COURT: You could see just as well; is that correct?
THE WITNESS: Yes, sir.
*Id.* at 301–02.

his sister, to Coney Island, where she lived. The court examined appellant closely, questioning him about numerous minute details of the trip including what subway trains he had taken, at what stations he had boarded, transferred, and exited, and exactly where Beverly lived:

THE COURT: She lived in Coney Island?

THE WITNESS: Yes, your Honor.

THE COURT: Whereabouts?

. . . .

THE COURT: All right, what street, do you know?

THE WITNESS: No, she took me there.

THE COURT: What station did you get off at?

THE WITNESS: I don't remember the name of the station.

THE COURT: What line did you take, what subway line?

THE WITNESS: We take the No. 2 train at Nostrand Avenue.

THE COURT: No. 2 what?

THE WITNESS: The No. 2 train at Nostrand Avenue.

THE COURT: No. 2 train?

THE WITNESS: At Nostrand Avenue.

THE COURT: Nostrand near where?

THE WITNESS: Nostrand and Eastern Parkway.

THE COURT: And that took you to Coney Island?

THE WITNESS: We changed.

THE COURT: Where?

THE WITNESS: I think it's Atlantic Avenue we changed to another train. I don't remember the name of the train we take.

THE COURT: You went to Atlantic Avenue?

THE WITNESS: Yeah.

THE COURT: And there you changed?

THE WITNESS: Yeah.

THE COURT: You don't remember what train you took?

THE WITNESS: No, I don't remember the name of the train we take.

THE COURT: Or what station you got off?

THE WITNESS: Don't remember which station.

THE COURT: Go ahead, Mr. [District Attorney].

*Id.* at 647–49. Again we acknowledge the right, indeed frequently even the duty, of the trial judge to question a witness—most often this occurs in an effort to clarify and to avoid confusion. Occasionally, as seems to have occurred here, the judge's inquiry may be intended to test the witness' memory. Such an inquiry can be quite proper. We note, however, that, as Gayle answered the questions about his trip to Coney Island, the court asked a needlessly sarcastic question: "Did you go swimming on that day [January 2] with Beverly [off Coney Island]?" *Id.* at 647.

The conduct of the judge and the prosecutor with respect to the Rastafarian inquiry was the single most offensive conduct during the trial. Appellant contends that, despite the absence of any basis for the inquiry, the judge allowed the prosecutor to engage in an extremely prejudicial line of questioning—to inquire whether Gayle was a member of the Rastafarian religion and, without any apparent good faith basis, to ask whether the Rastafarians were assassins, implying that this provided Gayle's motive for the murder; further, that the judge joined in this offensive line of questioning, to the point of asking whether the Rastafarians were "animals."

Q [by the prosecutor]: [Mr. Gayle, d]o you know what the Resfarians [sic] are?

MR. GALIAN: Objection.

THE COURT: Objection overruled.

A I know what the Resfarian [sic] are.

Q What are the Resfarian [sic]?

A They are some Jamaicans.

Q What are they?

A They are some Jamaicans.

Q What are they, a church group, a football team?

A I see them on the street. I know they're Jamaicans.

THE COURT: What are they, animals?

THE WITNESS: They are people.

Q Is it a group?

A It's a set of people that I see all the time.

Q Are they assassins?

MR. GALIAN: Objection, your Honor, there's no evidence—

THE COURT: Objection is overruled.

A When you say assassins, could you explain to me what that mean?

Q Killers.

A I don't know of them.

Q Are you a Resfarian [sic]?

A No.

Q Didn't you come to this country to kill Dennis Nunes?

A No.

MR. GALIAN: Objection, your Honor. This is very prejudicial.

THE COURT: The objection is overruled. The witness has answered, "No," and that is all that the jurors have before them.

MR. GALIAN: Your Honor, at this time I make a motion for a mistrial.

THE COURT: The motion is denied.

MR. GALIAN: On the basis that it is a prejudicial remark made by the D.A. with no basis for it.

MR. ROSENBAUM: I object to counsel's comments.

THE COURT: Just a moment. Let me keep the record straight. The district attorney didn't make a single remark. He asked a question. The witness answered a question.

*Id.* at 685–87.

There was no predicate evidence, and we are unaware of any good-faith basis, for this line of questioning. The trial judge should have quickly put an end to any such inquiry absent at least a side-bar conference at which a good-faith basis for it was sought. We can only conclude from the record before us that this was a fumbling and unsuccessful search for some evidence of motive. There was a timely objection by defense counsel and a motion for a mistrial. He succeeded with neither.

Later, the word "animal" was used by the prosecutor during his summation. It occurred in the following context:

But is [the defendant] a truthful person? Does he merit your believability and understanding? Or is he that cool cucumber that ... sat back [in the courtroom] ... meekly and quietly and mumbled and muffled his answers? How would he be outside of this courtroom?

\* \* \* \* \* \*

Would he be the animal, the cool, sly animal that can saddle up to a man, put his arm around the shoulder and discharge a bullet into his gut as two witnesses told you he did, as a detective told you he admitted doing?

*Id.* at 886–87.

We find this use of the word "animal" much too attenuated in relation to the Rastafarian inquiry on cross-examination of Gayle, to attach to it the significance urged by appellant. Further, we note that quite properly there was no reference to the Rastafarians at all during the prosecutor's summation. Moreover, there was no objection by defense counsel to the above-quoted portion of the summation.

The inquiry about Rastafarians by the prosecutor and the court and the question posed by the judge "What are they, animals" was gross and unwarranted. Did it fatally affect the trial? Certainly, standing alone, we think not.

The closer question is whether the totality of events which occurred during the entire trial rendered the trial "not fair." Again, we think not, and we agree with Judge Bramwell that the petitioner was not denied a fundamentally fair trial. The conduct of the state trial judge in this case reflected a vigorous and active involvement by the judge, but it was not substantially different from the conduct of the trial judge in *Johnson v. Scully.* In *Johnson,* the trial judge took an unusually active role and also had witnesses repeat testimony damaging to the defendant, yet we found that the constitutional standard had not been exceeded.

We do not at all doubt that sarcasm, banter, bolstering, interference, and the like by a trial judge in a criminal case can be excessive to the point where it leads to the conclusion that a defendant has been

denied a fair trial. Although we find instances involving the trial judge's conduct in this case to be unwarranted and sometimes even offensive, overall we do not consider his conduct to have reached the level of a constitutional violation.

Were we to encounter such conduct in a criminal trial in our federal courts, it might be that we would exercise this court's supervisory powers and remand for a new trial. But this would implicate our own institutional considerations which are of a different genre than constitutional standards, and it cannot be gainsaid that we have no power or authority to apply *our* institutional considerations to *state* court proceedings. It is clear that:

> trial judge intervention will exceed federal standards of judicial propriety before transgressing the limits of fundamental fairness required by the Constitution.... The distinction reflects an important facet of federalism: federal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts and lack such authority with respect to state courts. The only commands that federal courts can enforce in state courts are those of the Constitution.

*Daye III,* 712 F.2d at 1571 (footnotes omitted).

It was well within the power of the trial judge to question witnesses including the defendant. As we have stated, such questioning most often occurs to test the memory of witnesses, to avoid confusion on the part of jurors, and to clarify points that are deliberately obfuscated or are simply confusing.

It is certainly true that the state judge did not test the recollection of prosecution witnesses with the same diligence with which he tested Gayle's recall. The simple fact is that Gayle's testimony exhibited far more internal inconsistency than that of any other witness during the trial. *See, e.g.,* Tr. at 663–70. A trial judge in testing witnesses' recollections is under no obligation to test every witness' recollection with equal thoroughness.

With respect to the instruction to the jury, it appears to be undisputed that the charge was not erroneous. Three modest exceptions were taken by defense counsel to the court's charge, *id.* at 965–67. Each was clearly of minor importance: one involved a question as to which of two detectives read Gayle's constitutional rights to him when he was apprehended; another involved whether "stores are open to twelve o'clock midnight...."; the third related to the court's "undue emphasis" as to motive not being required to be shown by the People. It is noteworthy that defense counsel made no requests with respect to the charge.

It is our conclusion that the appellant received a trial within constitutional parameters of fairness, and therefore we affirm the denial of the writ.

Affirmed.

OAKES, *Circuit Judge* (dissenting).

When Keith Gayle last came before this court over six years ago, he was found, incorrectly in my opinion, not to have exhausted his state remedies. *Gayle v. LeFevre,* 613 F.2d 21 (2d Cir.1980). The panel there held, with reliance on *Johnson v. Metz,* 609 F.2d 1052 (2d Cir.1979), that "considerations of 'federalism ... as a basis for the doctrine of exhaustion of state remedies [are] particularly cogent in cases such as this where the conduct of the state trial judge is at issue.'" 613 F.2d at 23 (quoting *Johnson,* 609 F.2d at 1055). Having exhausted his state remedies so as to take into account those "considerations of 'federalism'" and here on the merits at long last, Gayle is still haunted by "principles of comity and federalism" which are said by the majority today to "warrant our respectful attention." I had thought that those principles had been fully taken into consideration, if not well served, by the six years' delay in this court's getting to the merits of the case, especially since the foundation stone on which Gayle's return to the state courts rested, *Johnson v. Metz* (and, implicitly, Gayle's own case), had been overruled by this court sitting en banc

in *Daye v. Attorney General*, 696 F.2d 186 (2d Cir.1982). Denial of a fair trial, whether by a trial judge's demonstrated bias, excessive intrusiveness, and unmistakable partisanship or by a mob-dominated atmosphere was, after all, a denial of due process of law cognizable in habeas corpus, as I thought it had been since *Moore v. Dempsey*, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923). Yet the "[p]rinciples of fundamental fairness" which represent, in the majority's opinion, "the constitutional litmus test we must apply" still are counterbalanced by "principles of comity and federalism." Today's opinion makes our power to use the writ of habeas corpus to guarantee the due process right to a fair trial border on the ceremonial.

The question before the court is whether Keith Gayle had a fair trial. Jamaican in background, an illegal alien, Gayle's cross-examination by an overbearing prosecutor who was all too chummy with the trial judge takes the nice line of inquiring about Rastafarians without a shred of evidence that Gayle was a Rastafarian, associated with Rastafarians, or even knew Rastafarians. Gayle, asked what they are by the prosecutor—over an overruled objection—replies that they are "some Jamaicans.... I see them on the street. I know they're Jamaicans." The trial judge whose conduct the majority finds not to have deprived Gayle of a fair trial intervenes to ask Gayle, "What are they, animals?"

Even the printed page cannot take away from the biting and devastating effect such a question would have coming from a trial judge, especially when it is followed by the prosecutor's asking, "Are they assassins?," and his overt implication in a highly improper question—absent underlying proof —"Didn't you come to this country to kill Dennis Nunes." [1] In overruling the defense objection to this question and denying a motion for a mistrial, the trial judge forgot a little piece of basic law that goes to fundamental fairness—that a question asked on cross-examination that, without

foundation, assumes facts in controversy or not in evidence is improper. 3 J. Wigmore, *Evidence in Trials at Common Law* § 780 (J. Chadbourn rev. ed. 1970). The erroneously permitted line of cross-examination and the judge's remark were exacerbated in argument by the language the prosecutor used in asking the jury to consider how Gayle would behave outside the courtroom: "Would he be the animal, the cool, sly animal that can saddle [*sic*] up to a man, put his arm around the shoulder and discharge a bullet into his gut ...?"

I will restate what I said in my original dissent in capsulating the facts:

The prosecution's entire case rested on the following: the testimony of two eyewitnesses, Gayle's flight when apprehended, and his supposed oral confession to Detective Bankhead immediately after the apprehension. The defendant took the stand, gave an alibi, but produced no witnesses. One of the eyewitnesses (Jones) [had] denied in his first statement that he was even at the party where the homicide took place, admitted on cross-examination that he had had five drinks of 150-proof Jamaican rum before he arrived at the party, and had bad eyesight in one eye. The other prosecution eyewitness (Foster) claimed that he did not discuss the case with anyone, including his cousin, Jones, until a couple of weeks before the trial, more than two and a half years after the killing. Tr. 401–03. Gayle's running upon apprehension was possibly explicable by the fact that he was an illegal alien and the apprehending detectives were in plain clothes. The detective's testimony as to a practically unsolicited, unwritten, unwitnessed confession, coupled with no inquiry as to motive, seems suspect on its face. The trial totally turned on credibility. The one piece of evidence that might have substantiated the eyewitnesses' version of the killing by demonstrating powder burns—the decedent Nune's [*sic*] clothing—was not produced even

---

**1.** Despite its lack of foundation, the prosecution relied on the "assassination" theory of this case,

using the word in both opening and closing statements.

though one would assume it was kept as evidence. In such a case, the judge's role assumed great importance.

613 F.2d at 25. I hold to the view that "the state court trial judge was all over this case like a tent." *Id.* I refer to the examples from the trial transcript cited or quoted in my previous dissent, *id.* at 25–27, and add a few illustrations here:

1. The judge's frequent interference [here defense counsel is cross-examining one of the investigating police officers who arrived at the scene]:

> MR GALIAN: I would like to have that marked for identification, your Honor.
>
> THE COURT: All right, the pat[r]olman's memorandum book marked for identification.
>
> (Memorandum book marked Defendant's Exhibit A for identification.)
>
> Q. Now, Patrolman O'Malley, would you look at that memorandum book at that page that is now marked for identification, and tell us, is there anything, any reference in that as to any—the names of any witnesses who were at the scene when you arrived?
>
> THE COURT: As to what?
>
> MR. GALIAN: As to the names of any witnesses who were at the scene.
>
> THE COURT: Just one minute, now. Did you testify you took the names of witnesses?
>
> THE WITNESS: No, sir, I didn't.
>
> MR. ROSENBAUM, In fact, he testified nobody would tell him anything.
>
> THE COURT: That's right.
>
> MR. GALIAN: I'm merely asking—
>
> THE COURT: Did you write names of witnesses in that book?
>
> THE WITNESS: No, sir, I did not.
>
> THE COURT: Did you have any witnesses—
>
> THE WITNESS: No, sir, I did not.
>
> THE COURT: —whose names were to be written anywhere?
>
> THE WITNESS: No, sir, I did not.
>
> MR. GALIAN: That is the information I would like to have, your Honor.

> THE COURT: You want him to testify to that again? Say it again, please.
>
> MR. GALIAN: That was the information I wanted.
>
> THE COURT: Did you get the names of any witnesses?
>
> THE WITNESS: No, sir.
>
> THE COURT: And the people told you, the people who were standing around said they knew nothing about it?
>
> THE WITNESS: That's correct, sir, no one knew anything.
>
> THE COURT: Yes, go ahead.

2. The judge's disparate treatment of defense and prosecution counsel. The first example involves defense counsel cross-examining the detective who had apprehended Gayle, and who claimed another detective had read Gayle his *Miranda* rights, but who testified that "to us it's a joke with the advisement of the rights ... on the street, right on the spur of the moment."

> Q. Well, now, is it your opinion, Officer, now, that the reading of the rights to an apprehended—
>
> THE COURT: Do you want to finish that?
>
> Q. —to a person who has been apprehended on the street is a foolhardy gesture?
>
> MR. ROSENBAUM: Objection.
>
> THE COURT: Now, do you want to press for an answer to that question?
>
> MR. GALIAN: Yes, I do.
>
> THE COURT: The district attorney's objection is sustained. We couldn't care less in this courtroom about the detective's opinion or yours or mine or the district attorney's. It is the law, Mr. Galian, that a suspect or a defendant be advised of his rights under the law, and the police officer indicated that he had his own idea of the circumstances under which this has to be done, but he said he complied. The defendant was advised of his rights. What his opinion is of it, we are not concerned with that at all.
>
> MR. GALIAN: Your Honor—

THE COURT: The objection is sustained.

MR. GALIAN: Your Honor—

THE COURT: No, no, counselor, excuse me, sir, I have ruled.

Next question, please.

THE COURT: Mr. Galian, forgive me, please. The rules of the Appellate Division—

MR. GALIAN: May I approach the bench?

THE COURT: Excuse me, sir. The Appellate Division rules require that when the Court makes a ruling, that ruling is not to be argued by counsel. I would not like to violate the rules of the Appellate Division of this court. I have made a ruling. If I want argument, Mr. Galian, I will ask for argument.

Now, I made a simple ruling upon a simple objection. I made my ruling. I will have no argument on it.

MR. GALIAN: May we approach the bench on it, your Honor?

THE COURT: All right, come up.

(Discussion at the bench off the record among Court and counsel.)

THE COURT: Now, counselor, if I thought that you were going to approach the bench to argue my ruling, I would have ordered you to proceed. Now, please proceed, counselor. I have made a ruling.

MR. GALIAN: Your Honor, I don't recall the answer—

THE COURT: Mr. Galian, forgive me again, we are not concerned—

MR. GALIAN: I am asking now—

THE COURT: Mr. Galian, don't interrupt me. I do not want argument on my ruling. This police officer was asked about his opinion of the law. We are not concerned with it. Now, Mr. Galian, you are pacing up—

MR. GALIAN: Your Honor—

THE COURT: Please, sir. Mr. Galian, now, do not interrupt me. I was about to say you are pacing the floor. I want to speak in a well-modulated tone of voice, and that's what I am doing. I

implore you, Mr. Galian, do not argue my ruling. That means, please do not argue my ruling. I have ruled.

Next question, sir.

MR. GALIAN: I was merely going to make a request that the previous answer be read. I don't recall it, your Honor.

THE COURT: There was no previous answer, because I sustained the objection.

MR. GALIAN: The last answer that was not objected to, your Honor.

THE COURT: All right, what was the question before counsel asked about the witness's opinion of the so-called Miranda rule? What was the question?

This is as opposed to the treatment of prosecution counsel just after eyewitness Jones testified on cross-examination to having about five drinks of 150-proof Jamaican rum during the day Nunes' homicide took place:

Q. Did you have anything to drink—

MR. ROSENBAUM: Your Honor, I object to counsel—

THE COURT: Don't do that.

MR. ROSENBAUM: If he wants to neigh, we have zoos.

THE COURT: Don't make any comments. Were you intoxicated?

THE WITNESS: No, sir. I drove my car there.

THE COURT: Go ahead.

Or again during the same cross-examination:

Q. And did they take a statement from you?

A. Yes, sir.

Q. In front of a court reporter?

A. Yes.

MR. GALIAN: May I have a copy of that statement?

MR. ROSENBAUM: Judge, can we recess until Thursday and put an end to my patience? I don't know about yours.

MR. GALIAN: I object to the remarks of the district attorney.

THE COURT: Yes. Excuse me, sir.

We will recess until Thursday morning, ten o'clock, five minutes before ten. Where's our clerk?

Or, during cross-examination of eyewitness Foster, when counsel was seeking to establish the rather incredible fact that Foster and Jones rode together back and forth to the police station without ever talking about the shooting:

Q. Now, while you were in the car that morning, did you and David discuss the shooting at all?

A. No.

Q. You didn't say anything at all about the shooting?

A. Just w[ha]t time we're going to the precinct.

Q. And nothing else was spoken between the two of you regarding the shooting?

A. No.

Q. So that on the way to the precinct from the shooting and on the way home after having been questioned, neither you nor David Jones uttered a word between you regarding the shooting?

MR. ROSENBAUM: That is objected to. For the third time he asked the same questions.

THE COURT: Yes, objection is sustained. The witness said they didn't discuss it.

Q. All right. Well, can I ask you what you did talk about?

A. Talked about women.

Q. Women?

A. Yeah.

Q. Did you talk about—

THE COURT: That is always a very interesting subject.

3. The judge leapt to the aid of the prosecution witnesses time and again, e.g., the cross-examination of Jones, who had originally given the police a different version of the facts from what he testified to on direct:

A. The facts that I told the police on the 2nd is different from the other one I told the Detective Bankhead, also the grand jury.

Q. I see. And the facts that you told Assistant D.A. Paul Zsufa differ from the facts that you told the jury and the Court last Monday, is that not true?

THE COURT: That's what he said.

MR. GALIAN: I beg your pardon?

THE COURT: That's what he said. The first statement you made was right after the shooting, you went to the station house—

THE WITNESS: Yes, sir.

THE COURT: —and you were there questioned by Assistant District Attorney Zsufa?

THE WITNESS: Yes.

THE COURT: You made a statement?

THE WITNESS: Yes, sir.

THE COURT: The questions read to you and the answers, you said you were asked those questions and made those answers, but that those answers were not true?

THE WITNESS: That's correct.

THE COURT: The next day, or on a Sunday, after that, Detective Bankhead spoke to you?

THE WITNESS: Yes.

THE COURT: And then you made a statement to Detective Bankhead?

THE WITNESS: That's correct.

THE COURT: He talked to you and you answered his questions?

THE WITNESS: That's correct.

THE COURT: Those answers which you gave to Detective Bankhead, were different from those you gave the Assistant District Attorney?

THE WITNESS: The answers I gave to Detective Bankhead was the truth.

THE COURT: Was the truth?

THE WITNESS: Yes, sir.

THE COURT: That was the second questioning?

THE WITNESS: Yes, sir.

THE COURT: All right, go ahead.

4. This contrasts with the judge's examination of Gayle himself:

Q. Did you go on any other day in January to Coney Island with Beverly Allen?

A. No.

THE COURT: Did you go swimming on that day [January 3] with Beverly?

THE WITNESS: No.

THE COURT: Just—

Q. Where did you go?

THE COURT: I'm sorry, go ahead.

Q. Where did you go in Coney Island?

A. Beverly's home.

Q. Sir?

A. To Beverly's house.

Q. Where was that located?

THE COURT: She lived in Coney Island?

THE WITNESS: Yes, your Honor.

THE COURT: Whereabouts?

THE WITNESS: I don't know where she live in Coney Island, but I know she live in Coney Island.

THE COURT: "I don't know whether she lives in Coney Island"—

THE WITNESS: I don't know where.

THE COURT: Oh, "where."

THE WITNESS: I don't know where.

THE COURT: All right, what street, do you know?

THE WITNESS: No, she took me there.

THE COURT: What station did you get off at?

THE WITNESS: I don't remember the name of the station.

THE COURT: What line did you take, what subway line?

THE WITNESS: We take the No. 2 train at Nostrand Avenue.

THE COURT: No. 2 what?

THE WITNESS: The No. 2 train at Nostrand Avenue.

THE COURT: No. 2 train?

THE WITNESS: At Nostrand Avenue.

THE COURT: Nostrand near where?

THE WITNESS: Nostrand and Eastern Parkway.

THE COURT: And that took you to Coney Island?

THE WITNESS: We changed.

THE COURT: Where?

THE WITNESS: I think it's Atlantic Avenue we changed to another train. I don't remember the name of the train we take.

THE COURT: You went to Atlantic Avenue?

5. Gratuitously the judge talked down to the defense:

[Direct examination of the eyewitness Jones]

MR. GALIAN: Objection, your Honor.

THE COURT: On what grounds, sir?

MR. GALIAN: They are leading questions.

THE COURT: Is that a leading question? You are objecting on the ground he is leading?

MR. GALIAN: Yes.

THE COURT: Mr. Galian, a leading question is one which suggests the answer.

MR. GALIAN: Your Honor—

THE COURT: Excuse me, Mr. Galian, please don't adopt an air of despair. I am overruling your objection. I always give my reasons why so that someone reviewing might understand why I do what I do.

A leading question is a question which suggests the answer. A question as, for instance, "On that day you went to such and such a place, did you not?" that would be leading. But the question, "Did you go there?" calls for a yes or no answer. The interrogator doesn't know what the answer will be. This is not leading nor is it suggesting; therefore it is not leading.

He wants to know if he was there. The witness may say yes and he may say no.

Let's hear what the answer is.

Your objection is overruled.

Or, during redirect examination of the same witness:

Q. Detective Bankhead asked you why you told Mr. Zsufa that you were not at the party, is that correct?

A. Yeah, I was outside in my car.

MR. GALIAN: Your Honor, I object to the form of these questions.

THE COURT: The objection is overruled.

Q. And what was your answer?

THE COURT: Just a minute. Mr. Galian, this is an adversary proceeding, you understand that. Now, you have a right to cross-examine. But when you develop a line of testimony which had not been gone into in direct examination, and you have a right to, the district attorney has a right in redirect to question a witness with reference to the circumstances surrounding the new line of investigation developed by you, and I must give the district attorney an opportunity to go into these matters.

MR. GALIAN: I didn't object to his entering into the line of questioning. I was objecting to the form of the questions as being leading.

THE COURT: The objection is overruled. In cross-examination and to some extent in redirect examination, in the Court's discretion, there may be permitted certain leading questions. But the Court will exercise its discretion when it appears to the Court that the interests of justice do not or should not countenance leading questions.

His questions particularly were not leading. He asked the witness, "Did Detective Bankhead say anything about why you, or ask you why you told a different story?"

MR. GALIAN: I am talking about the last question.

THE COURT: The answer to that could be yes or no. That isn't suggestive.

Or again, on Gayle's cross-examination:

Q. [by the Assistant District Attorney] Do you always tell lies?

MR. GALIAN: Objection, your Honor.

THE COURT: The objection is overruled.

Q. Do you always tell lies when you're in—have problems?

MR. GALIAN: I object to the form of the question.

A. No.

THE COURT: Mr. Galian, I beg you to please, if you want to argue with the Court, you can stand up and do that, but don't argue with the Court. I have made my ruling, Mr. Galian. This is cross-examination.

Go ahead.

Or later in Gayle's redirect:

Q. Now, you made a telephone call to—withdrawn.

Did you make a telephone call to Canada during the last two, three years?

THE COURT: Mr. Galian, I'm just wondering what has all this to do with the case on trial.

MR. GALIAN: I'm not too sure, your Honor.

THE COURT: Well, if you're not too sure—

MR. GALIAN: But Mr. Rosenbaum asked the questions on cross-examination, and I want to bring out—

THE COURT: What question was asked on cross-examination with reference to Canada?

MR. GALIAN: I believe there was—

THE COURT: When he went to Canada—

MR. GALIAN: Whether or not he had made telephone calls to Canada.

THE COURT: All right, Go ahead. Of course, evidently it was not connected with anything, and therefore it can't even be considered by the jury.

Now, you are spending a great deal of time or evidently you intend to, on redirect on the meaning of a call to Canada.

MR. GALIAN: That's true, your Honor.

THE COURT: Which in the first instance has nothing to do with that.

MR. GALIAN: If I was sure it had no prejudicial meaning, I would—

THE COURT: Mr. Galian, I will tell the jury now, if the district attorney asked whether or not he made a telepho[ne] call to Canada and if the witness said yes or no, without anything further, it doesn't mean a single, solitary thing. It serves no purpose unless—unless it were connected in some way with the issues in this case.

MR. ROSENBAUM: Well, your Honor, I don't want to argue with the Court's ruling, but as your Honor will, I'm sure, charge the jury that any questions asked by the People on cross-examination relate to the determination by the jurors as to the credibility of the defendant and as to his powers or recollection of specific dates and times.

THE COURT: Well, on the question of ability to recall, yes; that would be receivable, that would be competent, that would be proper, but for no other purpose.

MR. GALIAN: I understand, but the importance of his recollection would also be further fo[r]tified by his being able to relate the purpose for which he made that telephone call.

THE COURT: Except if the purpose is irrelevant and immaterial, I won't permit it.

The witness said he remembered a telephone call to Canada.

MR. GALIAN: Yes, your Honor.

THE COURT: All right.

This dissent could go on. There are innumerable other examples running throughout the transcript. In my view Gayle did not have a fair trial as a result of the excessive, biased intrusion of the trial judge. I would still grant the writ if the State did not afford Gayle a new trial.